United States Court of Appeals,

Fifth Circuit.

No. 96-60427.

CITY OF DALLAS, TEXAS;  City of Laredo, Texas, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION;  United States of America,
Respondents.

July 31, 1997.

Petitions for Review of an Order of the Federal Communications
Commission.

Before REAVLEY, JOLLY and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

States and municipalities routinely charge a franchise fee for
the right to operate a television cable system within its
jurisdiction.  Congress has required, however, that these fees be
no more than five percent of a cable operator's "gross revenue."
47 U.S.C. § 542(b).  In a final order, the Federal Communications
Commission determined that a cable operator's gross revenue does
not include money collected from subscribers that is allocated to
pay a franchise fee.  The cities of Dallas and Laredo, Texas appeal
this final order, contending that the FCC has ignored the plain
meaning of "gross revenue."

On appeal, the FCC presents several arguments in support of
its position.  The FCC first maintains that because the statutory
definition of "gross revenue" is ambiguous and its interpretation
is reasonable, we must defer to that interpretation.  The FCC also
contends that because a cable operator merely collects franchise

1

fees from subscribers on behalf of local governments, the fees do not constitute revenues for the operator. We reject both arguments. We hold that cable operator's gross revenue includes all revenues, without deduction.

I

This case began as a dispute between the City of Baltimore and a local cable provider, United Artists Cable of Baltimore ("UACB"). UACB had agreed to pay Baltimore a franchise fee equal to 5 percent of its "gross revenues." In calculating its gross revenue, UACB did not include money received from subscribers that it allocated to paying the franchise fee. For example, if a customer's monthly bill was $30.00, UACB would divide the bill into two portions: $28.56 allocated to "cable services," and $1.44 (*i.e.,* 5% of $28.56) allocated to pay the franchise fee.

The City of Baltimore contended that this method of calculation was incorrect. Instead, Baltimore argued that under the franchise agreement, UACB was required to pay 5% of the full sum collected from subscribers. Therefore, if a customer's bill was $30.00, the franchise fee would equal $1.50. Baltimore adopted a city rate resolution requiring UACB to include in the "gross revenue" calculation all money collected from subscribers, including money that was designated to pay the franchise fee.

UACB appealed the rate resolution to the FCC's Cable Services Bureau. UACB contended that Baltimore's method of calculating the franchise fee violated 47 U.S.C. § 542(b), which provides:

> For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not

2

exceed 5 percent of such cable operator's gross revenue derived in such period from the operation of the cable system.

The Cable Services Bureau issued an order directing that under Section 542(b), gross revenue did not include the amount collected by the cable operator that was allocated to pay the franchise fee. The Bureau reasoned that under Section 542(b), franchise fees are a tax calculated as a percentage of gross revenue, and are not part of gross revenue: "[U]nder the Act, a cable operator's gross revenue is revenue derived "from the operation of the cable system.' Franchise fees, on the other hand, are not revenues derived "from the operation of a cable system,' but rather are a charge levied by the franchising authority...." The Bureau's order concludes, therefore, that money allocated to pay franchise fees is not part of a cable operator's gross revenue.

The cities of Dallas and Laredo, as well as other municipalities, petitioned the Cable Bureau for reconsideration. The FCC released a *Memorandum Opinion and Order* (the "Commission Order"), denying the petitions for reconsideration, and upholding the order of the Cable Services Bureau.

The Commission Order notes that

the Bureau's holding is the most reasonable and correct interpretation of the statutory language at issue that is consistent with Congressional intent. Nothing in the statutory provisions of the Cable Act states that franchise fees are to be included in calculating an operator's "gross revenues."

Commission Order at ¶ 14.

Dallas and Laredo appeal this final order.[1]

## II

Our standard of review for deciding this appeal is governed by *Chevron USA v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron's* familiar two-step test, we first examine the statute for ambiguity using the "traditional tools of statutory construction." *Id.* at 842, 104 S.Ct. at 2782. We must attempt to find the meaning of the statute looking at the "particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988). *Chevron* did not eliminate the judiciary's proper role; the judiciary retains the right "to say "what the law is,' that is, to interpret statutes." *Mississippi Poultry Ass'n, Inc. v. Madigan,* 31 F.3d 293, 299 (5th Cir.1994) (quoting *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9). Nonetheless, if after applying these tools of statutory construction a court finds that a statute is ambiguous, it must defer to an agency's reasonable construction. *Chevron,* 467 U.S. at 843-44, 104 S.Ct. at 2781-83. Although there may be some debate about exactly when *Chevron* 's deference arises,[2] the court is duty bound to look at

---

[1]Dallas and Laredo appeal pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2344, which allow any party aggrieved by the final order of the FCC to file a petition to review the order in the court of appeals where venue lies.

[2]See, for example, the comments of Justice Scalia:

> In my experience, there is a fairly close correlation between the degree to which a person is (for want of a

obvious sources that may reveal what meaning Congress intended to invoke when using a phrase. Dictionary definitions, industry practice, and accounting standards are prime sources for the court to determine congressional intent. With this method of analysis established, we consider the substance of this appeal.

III

This appeal requires us to resolve a single, narrow question: Does Section 542(b) unambiguously mean that a cable operator's "gross revenue derived ... from the operation of the cable system" includes money collected from subscribers that is ultimately allocated by the cable operator to pay a franchise fee? We hold that it does. To demonstrate why we reach this conclusion, we first examine the meaning of the words "gross revenue."

A

The text of Section 542(b) provides that the "franchise fees paid by a cable operator ... shall not exceed 5 percent of such cable operator's *gross revenue* derived ... from the operation of the cable system." The phrase "gross revenue" has a generally accepted meaning: unless expressly limited by the terms of a

---

better word) a "strict constructionist" of statutes, and the degree to which that person favors *Chevron* and is willing to give it broad scope. The reason is obvious. One who finds more often (as I do) that the meaning of a statute is apparent from its text and from its relationship with other laws, thereby finds less often that the triggering requirement for *Chevron* deference exists. It is thus relatively rare that *Chevron* will require me to accept an interpretation which, though reasonable, I would not personally adopt.

Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 521 (1989).

statute, regulation or contract, gross revenues means all amounts received from operation of a business, without deduction. For example, *Black's Law Dictionary* defines "gross" as "before or without diminution or deduction" or "not adjusted or reduced by deductions or subtractions." "Gross Revenues" is defined by Black's as "receipts of a business before deduction for any purpose except those items specifically exempted."[3]

The Supreme Court has recognized that when a statute uses a technical term, we must assume that Congress intended it to have the meaning ascribed to it by the industry under regulation. *See McDermott International, Inc. v. Wilander,* 498 U.S. 337, 342, 111 S.Ct. 807, 810, 112 L.Ed.2d 866 (1991). Industry accounting practices require that money collected from subscribers to pay franchise fees be included in gross revenue. The Financial Accounting Standard Board's *Statement of Financial Accounting Standards No. 51* notes that "cable franchise fees are costs no different than the general manager's salary, marketing costs, and programming costs." Therefore, under the standard accounting practices money collected to pay franchising fees are included in gross revenue.

This definition of "gross revenue" is also consistent with how the phrase is commonly defined by the courts. For example, in *United States v. Reitano,* 862 F.2d 982, 985 (2d Cir.1988), the

---

[3]Webster's New International Dictionary, 1103 (2d Ed.1940) defines "gross" as "Whole; entire; total; without deduction.... The gross earnings, receipts or the like are the entire earnings, receipts or the like, under consideration, without any deduction."

court held that under the gambling laws, gross revenue includes all money coming into the possession of the business, regardless of the source or purpose for which it is used. *See also, Veterans Rehabilitation Center, Inc. v. Birrer,* 170 Mont. 182, 185, 551 P.2d 1001, 1003 (1976)(noting that "[g]enerally the term "gross revenue' means gross receipts of a business before deduction for any purpose except those items specifically exempted."); *Public Service Co. of Colorado v. Denver,* 153 Colo. 396, 403, 387 P.2d 33, 36 (1963)(same); *Lane Electric Cooperative, Inc. v. Oregon Dept. of Revenue,* 307 Ore. 226, 229, 765 P.2d 1237, 1238 (1988)(noting "the term "all gross revenue' ... is to be construed in the broadest sense, *i.e.,* all money received"). We conclude that normally the phrase "gross revenue" unambiguously means all revenues or receipts of a business, without deduction. We must, therefore, consider whether there is any basis to conclude that Congress intended—or even may have intended—the term "gross revenue" to have a specialized meaning in the context of Section 542(b). In other words, applying the "traditional tools of statutory interpretation," we must determine whether the term is ambiguous in the sense that deference under *Chevron* is owed to the FCC's interpretation of the term.[4]

B

---

[4]The Supreme Court has noted that a "fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Therefore, absent persuasive evidence to the contrary, we are required to give "gross revenue" its ordinary meaning.

There is nothing in the text of the statute, the structure of the statute, or the sparse committee reports to conclude that Congress intended "gross revenue" to have a specialized meaning as used in Section 542(b). Nonetheless, the FCC maintains that the meaning of the phrase in the context of the Section 542(b) is ambiguous because when Congress drafted the laws regulating the cable industry it was not drawing upon a blank slate. Instead, the statutory regulation supplanted a long-standing regulatory regime established by the FCC.[5] In connection with this argument, we will review briefly the history of the regulation of franchise fees.

In 1972, the FCC first adopted a rule limiting cable franchise fees to three percent of an operator's "gross subscriber revenues."[6] The FCC defined "gross subscriber revenues" to include

> [o]nly those revenues derived from the supplying of regular subscriber services, that is, the installation fees, disconnect and reconnect fees, and fees for regular cable benefits, including the transmission of broadcast signals and access and origination channels if any. It does not include revenues derived from per-program or per-channel charges, leased channel revenues, advertising revenues, or any other income derived from the system.[7]

In 1977, the FCC revised its rules so that franchise fees could be no more than five percent of "the franchisee's gross

---

[5]The FCC had primary authority to regulate franchise fees before the 1984 Communications Act.

[6]*Cable Television Report and Order,* 36 FCC 2d 141, 219-20 (1972)(the order provided for the approval of fees up to five percent on a showing of need by the franchising authority).

[7]*Amendment of Part 76 of the Commission's Rules and Regulations Relative to the Advisability of Federal Preemption of Cable Television Technical Standards on the Composition of a Moratorium on Non-Federal Standards,* 46 FCC 2d 175, 202 (1974).

revenues per year from all cable services in the community."[8] This revision had the effect of expanding the revenue base used to calculate franchise fees.

However, when enacting Section 542(b), Congress did not use the phrase "gross subscriber revenues," nor did it employ the phrase "gross revenues per year from all cable services in the community" to articulate the base upon which franchise fees are to be calculated. Instead, Congress departed from the language used by the FCC regulations, using the phrase "gross revenue derived ... from the operation of the cable system."

Nevertheless, the FCC argues that this history demonstrates that under the regulatory regime, the actual term "gross revenue" or "gross subscriber revenue" was given an unusually narrow meaning that excluded many forms of income. The FCC acknowledges that the language used in Section 542 is different from that used during the regulatory regime, but it argues that this difference actually creates an ambiguity: the term "gross revenue," in the light of the regulatory history, could either have a new definition or the traditional regulatory definition. The agency therefore argues that because the definition of "gross revenue" is ambiguous, under *Chevron* their interpretation must prevail. We do not agree.

Under *Chevron,* we begin our interpretation of this statute with the assumption that its unambiguous text accurately expresses

---

[8]Amendment of Subparts B and C of Part 76 of the Commission's Rules Pertaining to Applications for Certificates of Compliance and Federal-State/Local Regulatory Relationships. *See,* 66 F.C.C.2d 380.

the legislative intent of Congress;  such an assumption is only buttressed when Congress fails to accept a choice, provided by regulatory precedent, to use restrictive or artful language.  We therefore remain persuaded that Congress intended "gross revenue" to have its normal, ordinary, and common meaning.  We therefore turn to address the FCC's final argument that Section 542(b) is ambiguous.

C

The FCC finally contends that including revenue allocated to pay franchise fees as part of a cable operator's "gross revenue" creates peculiar consequences, which demonstrates that Congress did not intend for "gross revenue" to have its usual meaning.  We are unswayed by this argument.

First, the FCC and the intervenors, National Cable Television Association maintain that calculating cable bills using the traditional definition of gross revenue produces "a never-ending series of calculations—the mathematical equivalent to [a] hall of mirrors":

> Petitioners here contend that the maximum franchise fee should be calculated as follows (1) Take five percent of the gross operating revenues, i.e., revenues from subscriber services, programming, and advertising;  (2) add that amount to the operating revenues;  and (3) take five percent again of that sum.

This argument can summarily be dismissed.  A cable operator calculates a franchise fee simply by paying to the franchising authority an amount equal to 5% of its gross revenues.  For example, if a cable bill is $20, the cable operator must pay $1 in franchise fees, and may keep the remaining $19.  Alternatively, if

10

the cable operator intends to pass the entire cost of the franchise fee onto the consumer, it simply charges $21.05.  It must pay 5% of $21.05 ($1.05) to the franchising authority and it may keep the remaining $20.[9]  No infinite series of calculations results.  We therefore conclude that "gross revenue" is unambiguous.  We must now resolve a final FCC argument.

IV

The FCC argues that, in any event, the term "gross revenue," even given its normal and ordinary meaning, cannot include money collected to pay franchise fees.  The FCC contends that a cable operator is merely acting as a conduit, collecting franchise fees from subscribers on behalf of the franchising authority, in the same way as a merchant collects sales tax for the state.  If this position is correct, then regardless of the definition of gross revenue, the sum collected to satisfy the franchise fee would not be included in the operator's gross revenues.

Franchise fees are not a tax, however, but essentially a form of rent:  the price paid to rent use of public right-of-ways. *See, e.g., City of St. Louis v. Western Union Telegraph Co.,* 148 U.S. 92, 13 S.Ct. 485, 37 L.Ed. 380 (1893)(noting that the fee paid to a municipality for the use of its rights-of-way were rent, not a tax); *Pacific Tel. & Tel. Co. v. City of Los Angeles,* 44 Cal.2d 272, 283, 282 P.2d 36, 43 (1955)(same); *Erie Telecommunications v. Erie,* 659 F.Supp. 580, 595 (W.D.Pa.1987), *affirmed on other*

---

[9]In general form, the cable operator may first calculate its subscriber charge net of the cost of franchise fees.  Dividing that sum by 0.95 produces the gross subscriber charge.

11

*grounds,* 853 F.2d 1084 (3d Cir.1988)(same in cable television context).  Furthermore, even if franchise fees were treated as a tax, they would still be treated as a normal expense of doing business unless the tax was imposed directly upon the subscriber. Courts have held that gross revenue generally includes revenues collected for taxes.  *See, e.g., Wirtz v. Charleston Coca Cola Bottling Co.,* 356 F.2d 428, 430 (4th Cir.1966);  *Lucky Lager Brewing Co. v. Commissioner,* 246 F.2d 621, 623 (9th Cir.1957).[10]

A second argument that cable operators are acting as mere conduits is based upon the format of cable bills.  Under the Cable Act of 1984, a cable operator is allowed to identify the cost of government regulation on their subscriber bills.[11]  This format does

---

[10]For example, in *Lash's Products Co. v. United States,* 278 U.S. 175, 49 S.Ct. 100, 73 L.Ed. 251 (1929), a federal law imposed a tax on soft drinks "equivalent to ten percentum of the price for which sold."  *Id.* The taxpayer contended it was merely acting as a conduit, passing the tax on to the consumer.  Therefore, according to the taxpayer, the tax should have been collected on the price of the drink less the amount allocated to the tax.  The Court, speaking through Justice Holmes, rejected this position:

> The phrase "passed the tax on" is inaccurate....  The purchaser does not pay the tax.  He pays or may pay the seller more for the goods because of the seller's obligation, but that is all....  The price is the total sum paid for the goods.  The amount added because of the tax is paid to get the goods and for nothing else. Therefore, it is part of the price.

*Id.* at 176, 49 S.Ct. at 100.

Other cases also have adopted this approach.

[11]In introducing the final version of the Section 542(c) amendment in 1992, Senator Lott noted:

> I would like to offer my amendment ... dealing with subscriber bill itemization, to give the cable companies an opportunity to itemize these so-called hidden costs to

12

not, however, transform a cost imposed on cable operators into a cost imposed upon cable subscribers. It is true that the Act allows franchising authorities to directly impose franchising fees upon customers. Given that such a fee would hardly be politically popular, it is not surprising that most governmental entities have chosen not to follow this course—and, in any event, that certainly is not the case before us. When franchising agreements impose fees directly upon cable operators, any money collected to pay those fees will be part of the operator's gross revenue—which is the case before us.

In sum, there can be no doubt that franchise fees imposed on the cable operator are part of a cable operator's expense of doing business. There is no plausible basis to conclude that cable operators are acting as collection agents on behalf of franchising authorities.[12]

---

> explain to people what is involved in the charges so they will know it is not just the cable company jacking up the prices.... The fact is sometimes the rates have gone up because of hidden, unidentified increases in fees or taxes *which the cable [operator has to pay* ]....

138 Cong. Rec. S. 569 (Dailey ed. January 29, 1992)(emphasis added).

[12]We summarily dismiss the argument that applying the "traditional definition" is in conflict with Section 542(b)'s goal of restraining municipalities from "taxing [cable operator's] to death." *See,* statement of Senator Goldwater, 129 Cong. Rec. 15461 (June 13, 1983). The difference between the traditional definition of "gross revenue" and the definition urged by the FCC will not result in a significant increase in cable bills. Under the definition of "gross revenue" we adopt today, the franchise fee on a $30.00 cable bill would be $1.50. Under the FCC's definition, the cable bill would be $28.50 plus a $1.43 franchise fee, or a total bill of $29.93 or a less than a one-quarter of one percent increase.

V

In conclusion, gross revenue normally includes all revenue collected from any source.  No evidence has been presented to show that Congress intended to depart from this standard definition of gross revenue in enacting 542(b).  Moreover, there is no evidence that cable operators are merely acting as agents, collecting the franchise fees on behalf of municipal governments.  Therefore, all money collected from subscribers, including funds used to pay franchise fees, must be included in a cable operator's gross revenue.  For the reasons stated herein, the order of the Commission is set aside and the petition of Dallas and Laredo is

GRANTED.