United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 27, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 01-60804

————————

TEXAS COALITION OF CITIES FOR UTILITY ISSUES; NATIONAL ASSOCIATION OF TELECOMMUNICATIONS OFFICERS AND ADVISORS (NATOA),

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

Respondents.

————————

Petition for Review of an Order of
the Federal Communications Commission

————————

Before SMITH, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The Texas Coalition of Cities For Utility Issues ("TCCFUI") and the National Association of Telecommunications Officers and Advisors ("NATOA") petition this Court for review of a final order of the Federal Communications Commission ("FCC" or "Commission"). The contested order determined that cable system operators were permitted, at any time, to pass through to cable subscribers the full amount of the franchise fees imposed on operators by local franchising authorities

("LFAs") and to identify the amount passed through on subscribers' bills. TCCFUI and NATOA, on behalf of several intervenors,[1] contend that, where the franchise fee is based on a percentage of the operator's gross revenue, only the portion of that fee attributable to revenue from subscribers may be passed through to subscribers. They argue that the FCC's order should be reversed because it conflicts with 47 U.S.C. §§ 542 and 543. They also contend that the order is arbitrary and capricious because it contravenes the FCC's regulations, orders, and policies. Because the Commission has acted within its broad discretion, we deny the petition for review.

I

"States and municipalities routinely charge a franchise fee for the right to operate a television cable system within [their] jurisdiction." *City of Dallas v. FCC*, 118 F.3d 393, 393 (5th Cir. 1997). "[T]he term 'franchise fee' includes any tax, fee, or assessment of any kind imposed by a franchising

---

[1] The intervenors aligned with petitioners are the City of Pasadena, California; the Metropolitan Government of Nashville and Davidson County, Tennessee; the City of Albuquerque, New Mexico; and the National League of Cities. In addition, several Ohio LFAs and organizations representing their interests have filed an amicus brief in support of petitioners. Charter Communications Entertainment II, L.L.C. ("Charter") and the National Cable and Telecommunications Association have intervened and filed a separate brief in support of the FCC's order. To the extent that the intervenors have raised issues not addressed by petitioners, we decline to consider them. *See Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 438 (5th Cir. 1999) ("*TOPUC I*") ("[I]ntervenors may not challenge aspects of the Commission's orders not raised in the petitions for review." (quoting *United Gas Pipeline Co. v. FERC*, 824 F.2d 417, 437 (5th Cir. 1987)).

Intervenor Charter has also moved to strike portions of the joint appendix, contending that the appendix violates Fifth Circuit Rule 30.2(a) because it contains portions of the record that were not referred to in the parties' briefs. Rule 30.2(a) states that a petitioner seeking review of an agency order "must prepare and file with the court and serve upon the agency . . . a copy of the portions of the record relied upon by the parties in their briefs." Charter does not contend that the appendix contains matters outside the record, nor does it cite any authority for the proposition that including more of the record than required by Rule 30.2(a) is grounds for a motion to strike. Accordingly, the motion to strike is DENIED.

authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such. . . ." 47 U.S.C. § 542(g)(1). A franchise fee is "essentially a form of rent: the price paid to rent use of public right-of-ways." *City of Dallas*, 118 F.3d at 397. Although a LFA may impose its franchise fee directly on cable subscribers, "it is not surprising that most governmental entities have chosen not to follow this course," since "such a fee would hardly be politically popular." *Id.* at 398.

Franchise fees imposed on the operator can be assessed in any number of ways so long as the total amount does not exceed five percent of the operator's annual gross revenue. *See* 47 U.S.C. § 542(b) ("For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services."). This dispute involves the most common method of assessing franchise fees, under which the LFA maximizes the amount collected by requiring the operator to pay a fee equal to five percent of gross revenue. A cable operator's gross revenue includes revenue from subscriptions and revenue from other sources) ) *e.g.*, advertising and commissions from home shopping networks. *See City of Dallas*, 118 F.3d at 398 ("[G]ross revenue normally includes all revenue collected from any source.").

It is undisputed by the parties that a cable operator may pass the portion of the franchise fee attributable to subscription revenue through to subscribers and may identify that amount on the subscribers' bills. This litigation arises out of decisions by some operators in areas where the franchise fee is five percent of gross revenue to pass through to subscribers the full amount of the fee. A number of localities, including the City of Pasadena, California, requested that the FCC prohibit this practice, contending that it constituted an improper shifting of costs onto subscribers and that

each class of the operators' customers should bear a proportionate amount of the franchise fee) ) *i.e.*, the portion of the franchise fee attributable to advertising revenue should be passed through to advertisers, and so forth. The localities also contended that, even if full pass through to subscribers was permitted, operators could only increase the amount passed through at the intervals set by the FCC's regulations and could not inform subscribers that the full amount was included in their bills. The Commission ruled against the localities on all issues. *See The City of Pasadena, Cal., et al.*, Petitions for Declaratory Ruling on Franchise Fee Pass Through Issues, Memorandum Opinion and Order, 16 FCC Rcd. 18,192 (released Oct. 4, 2001) ("Pasadena Order").

II

TCCFUI and NATOA contend that, under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), the Pasadena Order must be reversed because 47 U.S.C. §§ 542 and 543 expressly prohibit cable operators from passing the entire franchise fee through to subscribers. In the alternative, they contend that the FCC's interpretation of those provisions is arbitrary and capricious. We disagree on both counts.

When reviewing an agency's construction of a statute, we apply *Chevron*'s two-step analysis. Under step one, where "Congress has directly spoken to the precise question at issue," we must "give effect to the unambiguously expressed intent of Congress" and reverse an agency interpretation that does not conform to the plain meaning of the statute. *Chevron*, 467 U.S. at 842-43. If the statute is silent or ambiguous as to the question at issue, we proceed to the second step of the *Chevron* analysis to determine "whether the agency's answer is based upon a permissible construction of the statute." *Id*. at 843. Under this second step, we can reverse the agency's decision only if it was "arbitrary, capricious, or manifestly contrary to the statute." *Id*. at 844. If the decision is based on

-4-

a reasonable interpretation of the statute, we defer to the agency's construction. *Id.* ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."); *see also Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 320 (5th Cir. 2001) ("*TOPUC II*") ( "The question is not whether we might have preferred another way to interpret the statute, but whether the agency's decision was a reasonable one.").

TCCFUI and NATOA first argue that 47 U.S.C. § 543(b)(2)(C)(v) prohibits pass through of the entire franchise fee to subscribers. The Cable Television Consumer Protection and Competition Act of 1992 ("1992 Cable Act") directed the FCC to prescribe and periodically revise regulations "protecting subscribers of any cable system that is not subject to effective competition from rates for the basic service tier that exceed the rates that would be charged for the basic service tier if such cable system were subject to effective competition." Pub. L. No. 102-385, § 3(a), 106 Stat. 1460 (codified at 47 U.S.C. § 543).[2] Section 543(b)(2)(C) provides that the FCC "shall take into account" seven factors when prescribing these regulations, including "the reasonably and properly allocable portion of any amount assessed as a franchise fee, tax, or charge of any kind imposed by any State or local authority on the transactions between cable operators and cable subscribers. . . ." 47 U.S.C. § 543(b)(2)(C)(v). In setting the rates for the basic service tier, the Commission determined that, because franchise fees are set by LFAs, they are outside the control of the cable operator and therefore should be afforded external treatment) *)i.e.*, excluded from the calculation of the

---

[2] "The basic service tier includes local broadcast channels; those non-commercial public, educational, and government-access channels that the cable system is required by its franchise to carry; and such additional channels as the cable operator may in its discretion include in this tier." *Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 162 (D.C. Cir. 1995); *see also* 47 U.S.C. § 543(b)(7).

permissible rate for basic cable service and then added back in to the monthly subscriber charge.[3]

This determination was upheld as reasonable by the District of Columbia Circuit in *Time Warner Entertainment Company v. FCC*, 56 F.3d 151 (D.C. Cir. 1995) ("*Time Warner I*"):

> [T]he Commission's decision to grant external treatment to [franchise fees and other franchise-related costs] was in part meant to give effect to the specific provisions of the [1992 Cable Act] that require the Commission to take into account, in prescribing rate regulations for the basic service tier, both franchise fees and other costs associated with meeting franchise requirements. 47 U.S.C. §§ 543(b)(2)(C)(v), (vi). . . . The Act is also intended to promote the expansion and diversification of cable programming . . . which is more likely to come about if cable operators may recoup their costs from subscribers willing to pay for more expensive and therefore presumably better programs. Although the statute may not require the Commission to grant external treatment to franchise-related and programming costs, the cited provisions surely give the Commission the authority to do so, particularly in the absence of evidence indicating that cable operators do in fact have substantial control over such costs.

*Id.* at 172 (citations omitted).

TCCFUI and NATOA do not contend that the Commission failed to take § 543(b)(2)(C)(v) into account when it set the rates for the basic service tier. Instead, they appear to argue that, by directing the FCC to "take into account . . . the reasonably and properly allocable portion of any amount assessed as a franchise fee . . . on the transactions between cable operators and cable subscribers" when setting rates, Congress intended to prohibit cable operators from passing the

---

[3] *See* 47 C.F.R. § 76.922(a) ("The maximum monthly charge per subscriber for a tier of regulated programming services offered by a cable system shall consist of a permitted per channel charge multiplied by the number of channels on the tier, plus a charge for franchise fees."); *In the Matter of Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation*, Report and Order and Further Notice of Proposed Rulemaking, 8 FCC Rcd. 5631 at ¶¶ 254, 256 (released May 3, 1993) ("1993 Rate Order") (stating that franchise fees are excluded from the calculation of rates because they are "largely beyond the control of the cable operator").

remainder of the franchise fee through to subscribers. This is not the plain meaning of the statutory language. Section 543(b)(2)(C)(v) says nothing whatsoever about the pass through of franchise fees. The only mandate imposed by § 543(b)(2)(C) is that the Commission "take into account" the listed factors. *See Time Warner I*, 56 F.3d at 165 ("[T]he text of the [1992 Cable Act] and its legislative history do not even provide the Commission with any guidance about how to weigh the seven factors that it is supposed to take into account. . . ."). Significantly, in contrast to § 543(b)(2)(C)(iii), § 543(b)(2)(C)(v) does not state that the FCC may *only* take into account the portion of the franchise fee attributable to transactions between operators and subscribers. *See* 47 U.S.C. § 543(b)(2)(C)(iii) ("[T]he Commission . . . shall take into account . . . *only* such portion of the joint and common costs (if any) of obtaining, transmitting, and otherwise providing . . . signals [for the basic service tier] as is determined . . . to be reasonably and properly allocable to the basic service tier. . . ." (emphasis added)).[4] "The Congress thus refrained from micromanaging the Commission in the way that the . . . petitioners now ask the court to do." *Time Warner I*, 56 F.3d at 165 (declining to read additional requirements into § 543(b)(2)(C)(i), which directs the FCC to "take into account . . . the rates for

---

[4] For the first time at oral argument, petitioners referred to language from the legislative history of § 543 "direct[ing] the Commission to attribute such costs to the basic tier *only* to the extent a portion of such costs are properly allocable to the costs of the basic cable service tier." H.R. REP. NO. 102-628, at 83 (1992) (emphasis added). From this, petitioners reason that the word "only" should be incorporated into § 543(b)(2)(C)(v). "Needless to say, we do not generally consider points raised for the first time at oral argument." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 562 n.2 (5th Cir. 2002). Moreover, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997) (internal quotation marks and brackets omitted)). We therefore decline to read the word "only" into § 543(b)(2)(C)(v).

cable systems, if any, that are subject to effective competition").[5]

We therefore conclude that the text of § 543 does not indicate an unambiguous intent on the part of Congress to prevent operators from passing the entire franchise fee through to subscribers. Moreover, petitioners have not shown that, under the second step of *Chevron*, the Pasadena Order reached an arbitrary or capricious conclusion when it determined that "[t]here is nothing in either the text or legislative history of Section [543] to indicate that Congress intended other than the full amount of the franchise fee to be reflected in a cable operator's rates, or that a specific class of franchise fee should be excluded from such rates." Pasadena Order ¶ 15.

TCCFUI and NATOA next contend that the Pasadena Order conflicts with 47 U.S.C. § 542(c)(1), which provides that "[e]ach cable operator may identify, consistent with the regulations prescribed by the Commission pursuant to section 543 of this title, as a separate line item on each regular bill of each subscriber . . . [t]he amount of the total bill assessed as a franchise fee and the identity of the franchising authority to which the fee is paid." They contend that the words "amount of the total bill assessed as a franchise fee" mean that only the portion of the franchise fee attributable to the charges on the subscriber's bill can be passed through to the subscriber. Section 542(c)(1), however, simply states that the operator may inform the subscriber of the amount included in the subscriber's bill that is attributable to the franchise fee imposed on the operator by the LFA. *See also* 47 U.S.C. § 542(f) ("A cable operator may designate that portion of a subscriber's bill attributable to the franchise fee as a separate item on the bill."). The statute says nothing about how this amount

---

[5] Petitioners also argue that the Pasadena Order is contrary to another of the § 543(b)(2)(C) factors, which directs the Commission to "take into account . . . the revenues (if any) received by a cable operator from advertising from programming that is carried as part of the basic service tier or from other consideration obtained in connection with the basic service tier." 47 U.S.C. § 543(b)(2)(C)(iv). For the reasons already stated, this argument fails.

is to be determined.[6]

In an attempt to demonstrate that the Pasadena Order is based on an arbitrary and capricious interpretation of § 542(c), TCCFUI and NATOA cite an excerpt from a report of the House Energy and Commerce Committee on the 1992 Cable Act, which states that:

> The cable operator shall not identify cost itemized pursuant to [§ 542(c)] as separate costs over and beyond the amount the cable operator charges a subscriber for cable service. The Committee intends that such costs shall be included as part of the total amount a cable operator charges a cable subscriber for cable service. For example, a cable operator might itemize . . . a $1.50 per month charge to account for a five percent franchise fee obligation. If a cable operator charges $30 per month for basic cable service, the $1.50 itemized charge shall be included in such amount; the cable operator cannot provide the cable subscriber a basic cable bill for $28.50, with a $1.50 additional charge added as a franchise fee. Thus, the bill would show a total charge of $30, but the cable operator would have the right to include in a legend a statement that the $30 basic cable service rate includes a five percent franchise fee, which amounts to $1.50.

H.R. REP. NO. 102-628, at 86. TCCFUI and NATOA contend that this example demonstrates that Congress intended the amount of the franchise fee passed through to the subscriber to be based solely on the monthly subscription charge. Consistent with the text of § 542(c)(1), however, this example simply illustrates how a franchise fee should be identified on a subscriber's bill. It does not indicate congressional intent to prevent pass through of the entire franchise fee to subscribers.[7] Moreover,

---

[6] Relying on § 542(c)'s statement that operators may identify the amount passed through "consistent with the regulations prescribed by the Commission pursuant to section 543," petitioners urge us to read § 542(c)(1) and § 543(b)(2)(C)(v) together. For the reasons discussed above, however, these provisions do not, separately or together, evidence an unambiguous congressional intent to prohibit pass through of non-subscription revenue to subscribers.

[7] Our use of a similar example in *City of Dallas* was intended only to demonstrate that the amount passed through to subscribers could be easily calculated. 118 F.3d at 397 (rejecting argument that including amounts collected as franchise fees in operators' gross revenue would result in "a

the FCC, relying on different legislative history, noted that "the policy of Section [542(c)] was to permit subscribers to be fully apprised of the effect of the enumerated governmentally imposed costs on their bills." Pasadena Order ¶ 7; *see* 138 CONG. REC. S561-02 (1992) (statement of Sen. Lott) ("I would like to offer my amendment . . . dealing with the subscriber bill itemization to give the cable companies an opportunity to itemize these so-called hidden costs, to explain to the people what is involved in the charges so they will know it is not just the cable company jacking up the prices."). Thus, the Pasadena Order's interpretation of § 542(c) was not arbitrary and capricious.[8]

TCCFUI and NATOA also argue that the FCC reached an unreasonable conclusion in construing the 1992 Cable Act's amendment of § 542(c) to indicate a congressional intent to permit pass through of the entire franchise fee to subscribers. Prior to the 1992 Cable Act, § 542(c) provided that "[a] cable operator may pass through to subscribers the amount of any increase in a franchise fee, unless the franchising authority demonstrates that the rate structure specified in the franchise reflects all costs of franchise fees and so notifies the cable operator in writing." This language was replaced with the current version of § 542(c), which authorizes itemization of specified amounts on subscribers' bills. Pub. L. No. 102-385, § 14. The Commission interpreted the pre-1992 language as "expressly limit[ing] a cable operator's franchise fee pass through to fee increases" and

never-ending series of calculations"). *City of Dallas* held that, for purposes of calculating five percent of a cable operator's gross revenue, gross revenue included money collected from subscribers for payment of the franchise fee. *Id*. at 398-99. Despite petitioners' repeated claims to the contrary, the Pasadena Order does not run afoul of *City of Dallas*, which did not consider the question presently before us.

[8] Petitioners also argue that, even if the full franchise fee may be passed through to subscribers, § 542(c)(1) nevertheless precludes operators from identifying the portion of the fee not attributable to subscription revenue. The text of § 542(c)(1) does not compel this result, and the Commission's determination that identification of the entire amount is consistent with the political accountability purpose of § 542(c) was not arbitrary and capricious. *See* Pasadena Order ¶ 23.

concluded that "[t]he apparent intent of [the] amendment was to enable cable operators to pass through to subscribers the entire amount of the franchise fee assessed by the LFA at any time regardless of whether the cable operator passed through the entire amount of the franchise fee at the first opportunity, or subsequently opted to do so." Pasadena Order ¶ 19; *see also id*. ¶ 15 (stating that the amendment to § 542(c) appears to support an inference that Congress intended to permit pass through of the entire franchise fee to subscribers). While not the only conceivable interpretation of the amendment, the Commission's construction does not rise to the level of arbitrary and capricious action under step two of *Chevron*.

III

TCCFUI and NATOA next argue that the Pasadena Order contravened established FCC policies and was otherwise unreasonable under § 706 of the Administrative Procedure Act ("APA"), which empowers courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While step two of the *Chevron* analysis focuses on the agency's interpretation of the relevant statutory provisions, review under § 706(2)(A) "focuses on the reasonableness of the agency's decision-making process pursuant to that interpretation." *Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 619 (5th Cir. 2000). Like *Chevron* step-two, however, "APA arbitrary and capricious review is narrow and deferential, requiring only that the agency 'articulate a rational relationship between the facts found and the choice made.'" *Id*. at 619-20 (quoting *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (internal brackets omitted)). "This standard is even more deferential where, as here, a Court is reviewing an agency's application and interpretation of its own regulations." *Citizens for Fair Util. Regulation v. U.S. Nuclear Regulatory Comm'n*, 898 F.2d 51, 54 (5th Cir. 1990) (citing *Robertson*

-11-

*v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)).

After reviewing the record and the abundance of administrative material cited by the parties, we conclude that TCCFUI and NATOA have not demonstrated that any pre-existing FCC policy prohibited cable operators from passing the entire franchise fee through to subscribers. Much of the administrative material cited by TCCFUI and NATOA simply does not apply in this context,[9] and the applicable materials do not indicate that the FCC ever intended that franchise fees would be passed through to anyone other than subscribers.[10] Indeed, the FCC has consistently stated that the entire franchise fee may be passed through to subscribers,[11] and, on at least one occasion, has expressly

---

[9] Many of the materials cited by petitioners address the allocation of costs under the "cost of service" regime, an alternative rate system used by operators who believe that the prescribed rates do not accurately account for their costs. *See In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation and Adoption of a Uniform Accounting System for Provision of Regulated Cable Service*, Report and Order and Further Notice of Proposed Rulemaking, 9 FCC Rcd. 4527 at ¶ 3 (released Mar. 30, 1994) ("The cost-of-service approach was to serve as a backup to the [standard rate-calculating] mechanism which a cable operator could invoke if it believed that the maximum rate under the [standard] formula would not enable the operator to recover costs that it reasonably incurred in the provision of regulated cable services."). That system is not at issue here. Other materials refer to cost allocation between service tiers, a now-irrelevant concept because only the basic service tier is still regulated by the FCC. *See* 47 U.S.C. § 543(c)(4) (providing that regulation of the cable programming service tier "shall not apply . . . after March 31, 1999").

[10] The only materials directly supporting petitioners' argument are forms and worksheets in which the FCC instructed operators that "any franchise fees you pay for the basic service tier should be added to your monthly rate as part of the service when billing your subscribers." FCC Form 393, Determination of Maximum Initial Permitted Rates for Regulated Cable Programming Services and Equipment at 3 (August 1993); *see also* FCC Form 1200, Setting Maximum Initial Permitted Rates for Regulated Cable Services Pursuant to Rules Adopted Feb. 22, 1994, at 22 (May 1994) (same). By themselves, however, these materials do not amount to an explicit policy against full pass through to subscribers, particularly in light of the strong evidence to the contrary.

[11] *See* 1993 Rate Order at ¶ 256 ("[W]e will permit *the total amount of franchise fees* to be included in determining the lawful regulated per channel rate for the basic service tier as of the initial date of regulation.") (emphasis added and footnote omitted); *see also In re Franchise Fee "Pass Through" and Dallas v. FCC*, Memorandum Opinion and Order, 13 FCC Rcd. 4566 at ¶ 4 (released

informed operators that they may pass the portion of the franchise fee attributable to non-subscription revenue through to subscribers. *See* Letter from Meredith J. Jones, Chief, Cable Servs. Bureau, FCC, to Thomas R. Nathan, Vice President/General Counsel, Comcast Cable Communications, Inc., 13 FCC Rcd. 9254 (released Sept. 18, 1997) ("The Commission has made clear that rates for basic and [cable programming service or 'CPS'] tiers may include pass-throughs of all franchise fees paid, including fees assessed on revenues obtained from sources other than the sale of basic and CPS service. . . . Thus, the Commission's regulations and policies permit a cable television operator to pass through to subscribers all franchise fees which are attributable to both regulated and unregulated services." (footnote omitted)). We therefore conclude that petitioners have not demonstrated that the Pasadena Order is contrary to FCC policy.

TCCFUI and NATOA also argue that the Pasadena Order contravenes 47 C.F.R. §§ 76.922 and 76.933. Section 76.933(g)(5) provides that, "when the franchising authority is regulating basic service tier rates, a cable operator may increase its rates for basic service to reflect the imposition of, or increase in, franchise fees." Petitioners contend that, because the LFAs have not increased franchise fees, an operator wishing to increase the amount passed through to subscribers must wait until the following quarter or year to increase charges to subscribers in accordance with 47 C.F.R. §§ 76.922(d) or (e). Section 76.933(g)(5) clearly provides, however, that rates may be raised to reflect "the imposition of . . . franchise fees." Thus, the Pasadena Order was not unreasonable in concluding that "[t]he[se] provisions do not . . . stand for the proposition . . . that only increases in

---

Mar. 2, 1998) ("Although cable operators are responsible for paying the franchise fee, under the Commission's subscriber rate regulations, cable operators may, in turn, 'pass through' to subscribers *the full amount of the fee*, which is an 'external cost' that is calculated separately from the maximum monthly charge per subscriber." (emphasis added and footnotes omitted)).

-13-

franchise fees are permitted to be passed through to subscribers, or that cable operators that have elected not to pass through the entire amount of a franchise fee are prohibited from subsequently so doing." Pasadena Order at ¶ 20.

TCCFUI and NATOA next observe that, under a regime in which the franchise fee is set at five percent of the operator's gross revenue, the fees collected by LFAs will increase as the operators' advertising and other non-subscription revenue grows. If operators are permitted to pass the entire cost of these fees through to subscribers, petitioners argue, operators will reap all the benefits of growth in non-subscription revenue while subscribers will bear all of the burden. The Commission acknowledged this possibility, but concluded that it was "constrained by [its] determination that such pass through is permissible under the Communications Act [of 1934, as amended] and [FCC] rules and that this process is consistent with the political accountability purposes of [§ 542]." Pasadena Order ¶ 16. Although the FCC conceded at oral argument that it was not actually compelled to reach any particular result, this conclusion is nevertheless entitled to deference because the Commission did not act irrationally in finding itself constrained to permit a practice that was allowed by the governing statutes and regulations and was consistent with congressional intent. Moreover, the Commission noted that, "[i]f LFAs and cable operators do not want to burden subscribers with higher franchise fee pass throughs, they may expressly omit certain items, such as advertising revenue and home shopping commissions, from the gross revenue definition." Pasadena Order ¶ 16. As discussed above, "the agency's decision need not be ideal," and must be upheld, "so long as it is not arbitrary and capricious. . . ." *Harris*, 19 F.3d at 1096 (quoting *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988)).

We have considered the petitioners' remaining arguments and conclude that they are

insufficient to demonstrate that the Pasadena Order is arbitrary and capricious under § 706(2)(A).[12]

For the foregoing reasons, the petition for review is DENIED.

---

[12] Petitioners also contend that certain cable operators misled subscribers by stating that the franchise fee had been raised, when in fact only the amount passed through had been increased. The Commission concluded that such "peripheral franchise fee matters . . . are not appropriately addressed in the context of this order and are more appropriately resolved in proceedings related to the specific factual circumstances in which they arise." Pasadena Order ¶ 24. The Commission's refusal to consider fact-specific complaints in the context of a request for a general declaratory order was not unreasonable.