**TIME WARNER ENTERTAINMENT–ADVANCE/NEWHOUSE PART-NERSHIP, Plaintiff,**

v.

**CITY OF LINCOLN, NEBRASKA, Defendant.**

No. 8:04CV219.

United States District Court,
D. Nebraska.

Jan. 10, 2005.

Gardner F. Gillespie, John J. Clasby, Hogan, Hartson Law Firm, Washington, DC, Gregory H. Perry, Perry, Guthery Law Firm, Charles M. Pallesen, Jr., Cline, Williams Law Firm, Lincoln, NE, for Plaintiff.

Steven J. Huggenberger, City Attorney'S Office, Lincoln, NE, for Defendant.

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

CAMP, District Judge.

This matter is before the Court on the Defendant City of Lincoln's Motion for Summary Judgment (Filing No. 58). The

parties have submitted briefs and indexes of evidence in support of their respective positions. For the reasons stated below, the City's Motion for Summary Judgment will be denied.

## FACTS

The Plaintiff Time Warner Entertainment—Advance/Newhouse Partnership ("Time Warner") brought this action for declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. § 2201; the Cable Act of 1984, 47 U.S.C. § 542; and 42 U.S.C. § 1983. (Amended Complaint, Filing No. 29 ¶ 3).

Time Warner and its predecessor have operated a cable television system under a franchise granted by the Defendant City of Lincoln, Nebraska (the "City"), in accordance with 47 U.S.C. § 541, since 1985. (*Id.* ¶ 11, and Exhibit A to Amended Complaint ("Franchise Agreement")). In late 2001, the City began an audit of Time Warner's franchise fee payments from May 1, 1995, to September 30, 2001. (*Id.* ¶ 18). In 2003, the City asserted that Time Warner had underpaid its franchise fees in an amount exceeding ten per cent of the franchise fees due for each year from 1995 through 2001. (*Id.* ¶ 19). The City demanded that Time Warner pay franchise fees of $310,042 and interest and penalties of $338,202, for a total of $648,244. (*Id.* ¶ 21). In October 2003, Time Warner voluntarily paid the City $19,775. (*Id*). In 2004, in an effort to collect the remaining amounts allegedly owed to the City by Time Warner, the City drew a total of $150,000 from letters of credit provided by Time Warner. (*Id.* ¶¶ 31–32).

In August of 2004, the City approved a Request for Renewal Proposal ("RFRP") for the renewal of Time Warner's cable franchise, defining "gross revenues" more broadly than Time Warner thinks appropriate for purposes of computing its fran-chise fees; requiring a $15,000 application fee; and requiring a grant fee equal to the City's direct costs in the franchising process less the amount of the application fee. (*Id.* ¶ 34).

Time Warner alleges that the City's actions are (1) a deliberate policy, practice and/or custom in violation of the Cable Act, entitling Time Warner to relief under 42 U.S.C. § 1983 (*id.* ¶¶ 39–41); (2) a breach of the franchise agreement (*id.* ¶¶ 43–45); (3) a breach of implied contract resulting in the City's unjust enrichment (*id.* ¶¶ 47–49); (4) a violation of the City's own Municipal Code (*id.* ¶¶ 50–51); and (5) an interference with Time Warner's rights under federal law, entitling Time Warner to injunctive relief (*id.* ¶¶ 53–55).

The City has moved for summary judgment, asserting that this Court lacks subject matter jurisdiction over Time Warner's claims related to the City's collection of allegedly-delinquent franchise fees because the Tax Injunction Act, 28 U.S.C. § 1341, provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The City asserts that the remaining issues raised by Time Warner are not ripe for review. (Filings No. 58 and 61). The City presents evidence establishing three facts material to the Court's analysis of the pending motion. First, the franchise fees collected by the City from Time Warner are placed in its general fund and are used for general municipal purposes. (Affidavit of Don Herz, Filing No. 67, ¶ 3). Second, the Lincoln Municipal Code's provision imposing the franchise fees is a legislative enactment of the City. (Affidavit of Joan Ross, Filing No. 66 ("Ross Aff."), Attachment A, § 8; Attachment B, § 5.16.170). Third, Time Warner has made no claim or de-

mand for return of any monies paid by it to the City, as required by Neb.Rev.Stat. § 15–840 (1997) as a precondition to maintaining any suit against the City. (Ross Aff. ¶ 4).

## STANDARD OF REVIEW

The Court must examine the record in the light most favorable to the nonmoving party in the context of a summary judgment motion. *U.S. ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir.2002). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25, 106 S.Ct. 2548.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348.

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548. Nevertheless, the Court's function is not to weigh the credibility and persuasiveness of evidence in the context of a motion for summary judgment. *Kampouris v. St. Louis Symphony Soc'y*, 210 F.3d 845, 847 (8th Cir.2000).

## ARE THE CABLE FRANCHISE FEES IMPOSED BY THE CITY A "TAX" UNDER 28 U.S.C. § 1341?

If the cable franchise fees imposed by the City under 47 U.S.C. § 542, the Lincoln Municipal Code (Ross Aff., Attachment B), and the Franchise Agreement, are in fact a "tax" under 28 U.S.C. § 1341, then this Court may not enjoin, suspend, or restrain the assessment, levy, or collection of those franchise fees as long as a plain, speedy and efficient remedy is available to Time Warner in Nebraska state courts. (28 U.S.C. § 1341).

The Cable Act, at 47 U.S.C. § 542(g), defines franchise fees to include "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such." Franchise fees specifically do not include "any tax, fee or assessment of general applicability." *Id.* The Cable Act at § 542(b) provides that "franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in [any twelve-month period] from the operation of the cable system to provide cable services."

The Lincoln Municipal Code § 5.16.170(a) provides that a "franchisee, in consideration of the privilege granted under the franchise for the use of public ways and the privilege to construct and operate a cable communications system, shall pay to the City five percent of its annual gross revenues during the period of its operation under the franchise." Section 5.16.040 of the Municipal Code defines "gross revenues" as:

[A]ll operating revenue from the cable communication system derived directly or indirectly by a franchisee, its affiliates, subsidiaries, parent, and any person in which the franchisee has a financial interest in association with the provision of cable communication services within the City, including, but not limited to service tier monthly fees, premium service fees, leased channel fees, converter rentals, studio rental, production equipment and personnel fees, advertising revenues, copyright fees; provided, however, that this shall not include any taxes on services furnished by the franchisee payable to the State of Nebraska or any other governmental unit and collected by the franchisee on behalf of said governmental unit, or any revenues from the provision of cable communication services outside the City, or any revenues from sale of capital assets or lease of property for purposes unrelated to cable communication systems.

The Franchise Agreement provides that Time Warner "shall pay to the City five percent (5%) of its annual gross revenues during the period of its operation under the Franchise, pursuant to the provisions of § 5.67.170 of the Lincoln Municipal Code," in addition to a grant fee and application filing fee. (Franchise Agreement p. 14, § XX).

▬ The City asserts, and the Court agrees, that the question of whether the franchise fees at issue are a "tax" under 28 U.S.C. § 1341 is a matter of federal rather than state law. *Wright v. McClain,* 835 F.2d 143, 144 (6th Cir.1987); *Robinson Protective Alarm Co. v. Philadelphia,* 581 F.2d 371, 374–76 (3rd Cir.1978); *Tramel v. Schrader,* 505 F.2d 1310, 1315 n. 7 (5th Cir.1975). The City also asserts, and the Court again agrees, that the issue cannot be resolved merely by reference to the name used (*e.g.,* tax, fee, assessment, etc.)

in the Cable Act, the Municipal Code, or the Franchise Agreement. *Valero Terrestrial Corp. v. Caffrey,* 205 F.3d 130, 134 (4th Cir.2000); *Burris v. City. of Little Rock,* 941 F.2d 717, 720 (8th Cir.1991). Consequently, Time Warner's assertion that the City itself has referred to the franchise fees as "rent" and "consideration" does not resolve the issue. Finally, the City suggests that the Court should use a three-part analysis described by the First Circuit Court of Appeals in *San Juan Cellular Telephone Co. v. Public Service Comm'n of Puerto Rico,* 967 F.2d 683 (1st Cir.1992), that also has been adopted in the Ninth Circuit (*Hexom v. Oregon Dept. of Transportation,* 177 F.3d 1134, 1136 (9th Cir.1999)), and the Fourth Circuit (*Valero,* 205 F.3d at 134). Time Warner agrees that the *San Juan Cellular* analysis is the most widely used test to determine whether monies are regulatory fees or taxes under the Tax Injunction Act. The First Circuit Court said:

> The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community … The classic "regulatory fee" is imposed by an agency upon those subject to its regulation…. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive … Or, it may serve such purposes indirectly by, for example, raising money place in a special fund to help defray the agency's regulation-related expenses.

*San Juan Cellular,* 967 F.2d at 685.

> The *San Juan Cellular* test calls for the consideration of three primary factors in determining whether an assessment is a tax: (1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3)

whether the assessment is expended for the general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed.

*Hexom,* 177 F.3d at 1137, quoting *Bidart Bros. v. California Apple Comm'n,* 73 F.3d 925, 931 (9th Cir.1996).

To determine whether a particular charge is a "fee" or a "tax," the general inquiry is to assess whether the charge is for revenue raising purposes, making it a "tax," or for regulatory or punitive purposes, making it a "fee." *See, Collins Holding Corp. v. Jasper County,* 123 F.3d 797, 800 (4th Cir.1997). To aid this analysis, courts have developed a three-part test that looks to different factors: (1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge.

*Valero,* 205 F.3d at 134.

■ The Court agrees that the three-part analysis described above is useful to determine whether the franchise fees at issue in this case are in fact a tax under 28 U.S.C. § 1341. To explain why the three factors in the *San Juan Cellular* analysis are important, a few, brief references to the dusty annals of history are helpful.

Before the American Revolution, Sir William Blackstone described the "true theory of taxation" that could co-exist with the "absolute right of personal property."[1] He said:

No subject can be constrained to pay any taxes, even for the support of government, but such as are imposed by his own consent or that of his representative in parliament.[2]

. . . . .

As the true idea of government consists in this, that some few men are deputed by many others, to preside over public affairs, so that individuals may better be enabled to attend to their private concerns, it is necessary that those individuals should be bound to contribute a portion of their private gains, in order to support such government and to reward such magistracy, which protects them in the employment of their properties.[3]

In Blackstone's description of taxation, we see the three elements alluded to in *San Juan Cellular:* (1) a legislative act, (2) imposing a tax on those who had the opportunity to vote for or against it in a democratic or republican process, and (3) the use of the funds for the general support of the government of such citizens.

It is not necessary that a tax be imposed directly on the citizens who have authorized it. It may be indirect. When discussing the merits of taxation provisions in the proposed Constitution, Alexander Hamilton said:

[T]he greatest part of the national revenue is derived from taxes of the indirect kind, from imposts, and from excises.[4]

. . . . .

[E]very duty on imports is incorporated with the price of the commodity, and ultimately paid by the consumer, with a profit on the duty itself as a compensation to the merchant for the advance of his money. . . . The consequence of the principle laid down is that every class of

---

1. Blackstone's Commentaries on the Laws of England, Book I, Chapter I, sec. 3; Chapter VIII, sec. 1.

2. Browne's Blackstone's Commentaries, p. 44.

3. *Id.* at p. 102.

4. The Federalist No. XII, Alexander Hamilton, Nov. 27, 1787.

the community bears its share of the duty in proportion to its consumption; which last is regulated by the comparative wealth of the respective classes, in conjunction with their habits of expense or frugality. The rich and luxurious pay in proportion to their riches and luxury [*e.g.*, HBO subscribers]; the poor and parsimonious, in proportion to their poverty and parsimony [*e.g.*, basic channel subscribers].[5]

Chief Justice John Marshall recognized a "sacred" right of states to impose taxes, limited only by the constitutional powers granted exclusively to the federal government. *Brown v. State of Maryland,* 25 U.S. 419, 448, 12 Wheat. 419, 6 L.Ed. 678 (1827). Like Hamilton, Marshall acknowledged that whether a tax is direct or indirect does not alter the essence of its nature. *Id.* at 444, 12 Wheat. 419.

Why is the power of taxation "sacred" compared to other more mundane functions of government? The power of taxation exercised by states and local governments has an elevated status under the Constitution, and under 28 U.S.C. § 1341, because it is (1) exercised by citizens through a democratic or republican process, (2) to impose upon *themselves* a direct or indirect financial burden in proportion to income, wealth, or consumption, (3) for the support of their common government.

■ Time Warner contends that the franchise fees imposed by the City satisfy none of these three criteria. The Court disagrees. With respect to the first criterion, it is undisputed that the City's legislative body, its City Council, has authorized certain franchise fees. The citizens of the City, therefore, have acted through the republican process. If the City's contractual undertaking with Time Warner is consistent with the City Ordinance, the first

*San Juan Cellular* criterion is met. With respect to the third criterion, it is also undisputed that the franchise fees are deposited in the City's general fund for the support of the City government. Although Time Warner contends that there is no evidence that the fees collected exceed the City's cost of regulating the cable industry, the fact that the fees are calculated as a percentage of Time Warner's gross revenues is itself evidence that the fees are *not* calculated according to the City's regulatory expense.

The second *San Juan Cellular* criterion is where the City's argument fails. As Time Warner points out, the City has ignored that criterion altogether in its brief. Time Warner contends that the second criterion is not met because the franchise fees are imposed on a single entity—Time Warner. While true, that misses the point. The City could well impose a tax on its citizens through a single utility provider, such as a gas, electric or water company, and the *San Juan Cellular* criteria would be met. With respect to the franchise fees at issue in this case, however, it is not clear that the fees are borne or even *could* be borne by the citizens of the City. If the franchise fees were assessed in the amount of five percent of Time Warner's gross receipts from cable subscribers within the City's jurisdiction, then the Court would agree with the City's position that the franchise fees are a "tax." The very issue raised by Time Warner in its Amended Complaint, however, is that the City has taken the position that Time Warner's "gross revenue" used to compute franchise fees under the Municipal Code and the Franchise Agreement includes other amounts not in any manner borne directly or indirectly by the residents of the City. Time Warner alleges that the City has improperly included in its definition of

---

**5.** Hamilton's report to Congress on Impost Duty, December 16, 1982.

"gross revenue" (1) agency commissions for advertising, (2) fees collected by Time Warner for payment to the Federal Communications Commission, (3) cooperative advertising support consisting of reimbursement to Time Warner for direct costs incurred on behalf of programmers, and (4) the value of certain marketing support received by Time Warner from programmers.

As a city of the primary class under Nebraska law, the City certainly has the power to levy taxes, including occupation taxes on public service providers "based upon a certain percentage of the gross receipts ... or upon such other basis as may be determined ... by the mayor and council." Neb.Rev.Stat. § 15–202 (1997). The City also has the power to "make contracts." Neb.Rev.Stat. § 15–201(5)(1997).

The franchise fees sought by the City may well be collectible. As described in the Amended Complaint, however, the fees sought by the City are a contractual matter between the City and Time Warner. The deference given to states and local governments under 28 U.S.C. § 1341 to assess, levy and collect their own taxes without interference by the federal courts is not applicable in this case as the issues are now framed.

The Fifth Circuit Court of Appeals reached a similar conclusion when approaching the issue from a different direction in *City of Dallas, Texas v. Federal Communications Commission*, 118 F.3d 393 (5th Cir.1997). A cable franchisee argued that its "gross revenue" used to calculate its franchise fee should not include money paid by subscribers that ultimately was used to pay franchise fees. The Fifth Circuit Court held that the franchise fees were not a tax, but essentially a form of rent, calculated as a percentage of revenues from subscriber services, programming and advertising. *Id.* at 397. As such, even if the franchise fees were called a "tax," they were merely a "normal expense of doing business unless the tax was imposed directly upon the subscriber." *Id.* at 398.

Having determined, based on the information before the Court at this time, that the franchise fees in dispute are not a tax under 28 U.S.C. § 1341, the Court need not address whether a plain, speedy and efficient remedy is available to Time Warner in the courts of Nebraska. With respect to the issue of whether Time Warner's claims regarding the City's application fee and grant fee are now ripe, the Court finds that despite the fact that the amount of the "grant fee" imposed by the City has not yet been determined, there does exist a "real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037–38 (8th Cir.2000)(quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), quoting *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945)). Those claims will not be dismissed for lack of ripeness.

IT IS ORDERED:

1. The Defendant's Motion for Summary Judgment (Filing No. 58) is denied;

2. The Plaintiff's Motion for Oral Argument (within Filing No. 68) is denied; and

3. The parties' oral request for a stay of proceedings is granted. The proceedings in this matter are stayed until March 10, 2005, or further order of the Court.