**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 3 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HIGH COUNTRY HOME HEALTH,
INC.,

       Plaintiff-Appellant,

v.

TOMMY G. THOMPSON, Secretary
of the United States Department of
Health and Human Services, and
DENNIS G. SMITH, Administrator of
the Centers for Medicare and Medicaid
Services, formerly known as the
Health Care Financing
Administration,[*]

      Defendants-Appellees.

No. 02-8096

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 99-CV-173-J)**

---

Charles F. MacKelvie, Chicago, Illinois, for Plaintiff-Appellant.

Nicholas Vassallo, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief), Cheyenne, Wyoming, for Defendants-Appellees.

---

[*]Mr. Thompson and Mr. Smith, who are the successors in office of Donna E. Shalala and Nancy-Ann Min DeParle, respectively, have been substituted as parties pursuant to Fed. R. App. P. 43(c)(2).

Before **SEYMOUR**, **HENRY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

The question presented is whether it was arbitrary or capricious for a Medicare administrative tribunal to dismiss an appeal for failure to meet a filing deadline. We conclude that it was not, and affirm the judgment of the district court.

BACKGROUND

Petitioner, High Country Home Health, Inc. ("High Country"), is owned and operated by a husband-and-wife duo, Reed and Marilyn Pedrick. During fiscal years ending ("FYE") in 1993, 1994, and 1995, Mr. Pedrick provided physical therapy services to Medicare-covered patients in their homes. In addition, he and his wife both spent substantial time working as administrators of the company. Each year, the company filed for and received Medicare reimbursements not only for the physical therapy visits, but also for the couple's administrative services. After further auditing, the fiscal intermediary that processed the reimbursement requests, a division of Blue Cross/Blue Shield of Alabama then known as Wellmark ("the Intermediary"), issued Notices of Program Reimbursement ("NPRs") for each of those fiscal years, stating that High

Country had been overpaid and requiring it to recoup the overpayments. High Country has been embroiled in litigation attempting to establish its right to the alleged overpayments ever since. This appeal concerns a missed filing deadline in an administrative appeal of the Intermediary's revised NPR for FYE 1994.

The Intermediary's initial NPR for FYE 1994 reduced the amount of High Country's physical therapy reimbursement but not its reimbursement for administrative compensation. High Country appealed the physical therapy cost determination, and on March 19, 1997, the Provider Reimbursement Review Board (the "PRRB" or "Board") decided that appeal. Then, on June 16, 1997, the Intermediary reopened its 1994 NPR and issued a revised NPR finding that High Country's administrative compensation was also excessive.

High Country filed its appeal of the second 1994 NPR on July 2, 1997. When High Country received its notice of hearing in December, the notice specifically warned counsel that failure to meet the applicable deadlines would result in dismissal, and that no further reminder would be sent. High Country's preliminary position paper was due to the Intermediary in early March, 1999, and its final position paper was due to the Board by June 1, 1999.

There is a factual dispute over whether the preliminary position paper was

ever filed,[1] but both sides agree that the final position paper was not timely filed. In a letter dated June 23, the Board notified counsel for High Country that it was dismissing the appeal. While that letter was in transit, on June 24, counsel for High Country (having independently realized the mistake) sent in the position paper, without any explanation for its lateness, by Federal Express overnight mail.

On June 28, counsel for High Country received notification of the Board's dismissal. The next day, he sent a letter requesting that the Board reopen the dismissed appeal. After that request was rejected, he urged the Board to reconsider in a second letter dated August 6, 1999. The Board curtly rebuffed his arguments, noting that it is a party's obligation to meet all relevant deadlines.

On appeal to the district court, High Country challenged both the Board's dismissal and the underlying revision to the 1994 NPR. The district court ruled that it had jurisdiction only over the Board's dismissal for untimeliness, and not over the merits. It initially remanded for reconsideration because it concluded that the Board's strict application of the final position paper deadline was

---

[1]Neither the Intermediary nor the Board has any record of receiving the preliminary position paper, and on March 24, 1999, the Intermediary included High Country's appeal on a list of cases it recommended the Board to dismiss because the preliminary papers had not been filed. The district court allowed High Country to supplement the record with a FedEx airbill showing that something was sent to the Board in December of 1997, as well as a cover letter to the Board from the same month stating that the preliminary position paper was enclosed and was also being sent to the Intermediary. There was no other evidence confirming that the paper had in fact been sent to the Intermediary.

probably based on a mistaken belief that High Country had already been delinquent by failing to file its preliminary position paper. The Secretary moved for reconsideration because the district court had decided that the preliminary paper had been filed on the basis of evidence never presented to the Board. On reconsideration, the district court vacated its previous order and upheld the Board's decision. This appeal followed.

DISCUSSION

I

High Country raises various objections to the Intermediary's decision to reopen the FYE 1994 determination. This Court's jurisdiction, however, is limited by 42 U.S.C. § 1395oo(f)(1):

> Providers shall have the right to obtain judicial review
> of any final decision by the Board, or of any reversal,
> affirmance, or modification by the Secretary . . . .

There is only one "final decision by the Board" at issue in this appeal: the dismissal for failure to timely file the final position paper.[2] Although that

---

[2]In March of 1999, well before the June 1 deadline, High Country moved for dismissal of the Intermediary's reopening itself (because the reopening violated proper procedures). In a one-page letter, the Board dismissed the motion, stating that under applicable regulations, the Intermediary had "exclusive jurisdiction" over the decision to reopen. *See* 42 C.F.R. 405.1885(c). The Board concluded that it has jurisdiction only over final determinations reached by the Intermediary. *See* 42 U.S.C. § 1395oo(a)(1)(A)(i). Accordingly, we need not consider whether the letter dismissing High Country's motion is subject to judicial review.

dismissal was not a decision on the merits, it is still a final decision subject to our jurisdiction. *UHI, Inc. v. Thompson*, 250 F.3d 993 (6th Cir. 2001); *see also Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 347-48 (4th Cir. 2001); *cf. Edgewater Hosp., Inc. v. Bowen*, 857 F.2d 1123, 1130-32 (7th Cir. 1988) (holding that federal courts have jurisdiction to review PRRB dismissals for want of jurisdiction). We review the Board's dismissal under the standards set forth in the Administrative Procedures Act, *see* 42 U.S.C. § 1395oo(f)(1), and will therefore uphold the decision of the Board unless it was "arbitrary and capricious," *see* 5 U.S.C. § 706(2)(A).

## II

As High Country points out in its brief, the Board is burdened by an immense caseload, consisting of more than 11,000 claims each year. Especially in such circumstances, procedural rules requiring timely filings are indispensable devices for keeping the machinery of the reimbursement appeals process running smoothly. Congress has given the Board "full power and authority" to make such rules, *see* 42 U.S.C. § 1395oo(e), and the Board has chosen to exercise that authority by setting strict deadlines. Its rules governing PRRB procedure at the time of High Country's default[3] contained this terse warning to providers: "If you

---

[3]Since the Board's decision in this case, the Board has deleted its procedural rules from the Provider Reimbursement Manual and published them, with some revisions, in a standalone document available on its website. The

-6-

fail to submit your final position paper to the Board by the due date, the Board may dismiss the appeal." Provider Reimbursement Manual ("PRM") § 2921.4E (1993) (repealed 2000).[4]

Strict procedural requirements like this one help manage a docket both by encouraging timely filing and by allowing the adjudicator to ignore late or improperly presented claims. But to a significant extent, these advantages are lost if a deadline is applied inconsistently or subjected to second-guessing by higher courts. If litigants know that they may be able to keep their claims alive despite missing a deadline, the procrastinators and the perfectionists may well decide to accept a chance of procedural default in return for another few days to improve their substantive argument. This problem is exacerbated once the deadline has

procedures currently in effect are, if anything, even more strict than the ones that applied to High Country. *See, e.g.*, PRRB Instructions II(B)(II) (effective Mar. 1, 2002), *at* <http://www.cms.hhs.gov/providers/prrb/inst2002.pdf> (last visited Feb. 16, 2004) ("The Board *will* dismiss your appeal if you fail to submit your final position paper by the Board's deadline." (emphasis added)); *id.* II(B)(I) (noting that under the new rules, failure to meet the preliminary position paper due date is also grounds for dismissal).

[4]High Country contends that this is the text of the provision only after it was "substantially amended" in August 1999 (although it erroneously refers to the provision as PRM § 2924.4E). Reply Br. 9. It gives no further detail about the alleged amendment, and its contention appears to be erroneous. According to materials submitted by both parties, the provision remained unchanged from its enactment in September of 1993 to its deletion in June 2000. *Compare* PRM § 2921.4E (1993), Appellees' Supp. App. 32, *with* PRM § 2921.4E, *reprinted in* Medicare and Medicaid Guide (CCH) ¶ 7704A at 2752 (2000), App. vol. 2. at 410.

passed. Then, the likely sanction for late filing becomes a sunk cost, and the price of an additional day to develop one's substantive argument is only the marginal increase in probability that the sanction will be imposed.

Of course, these costs should be balanced against the interest in remedying substantive injustices despite procedural technicalities. *See Inova*, 244 F.3d at 348. But for every plaintiff whose substantive claim or reason for default leads an adjudicator to excuse the default, ten less sympathetic plaintiffs are likely to demand similar treatment. The danger is that the deadline, which is supposed to help manage the burdens of a heavy caseload, will become a new (and less productive) font of litigation: instead of focusing on timely raised substantive claims, the adjudicator must expend resources on litigation about whether a party's excuse for missing the deadline was good enough, whether the deadline has been applied consistently, and so forth. All of this counsels in favor of applying our review of an administrative tribunal's procedural rulings especially sparingly.

## III

When a party misses a deadline, it has several predictable avenues for attempting to avoid the resulting penalty. It can argue that there is a valid excuse for the tardiness; that some other filing should be deemed equivalent to the missed filing, so that the deadline was actually satisfied; that the party had no

proper notice of the deadline; or that the deadline itself is invalid or inconsistently applied. High Country pursues all four strategies.

A

First, High Country argues that the PRRB should have excused its late filing because of extenuating circumstances. It explains, as it did in its June 29 request for reinstatement, that the office manager of its legal counsel disappeared in mid-June, 1999, apparently stealing computer equipment containing firm records. While we may sympathize with counsel's misfortune, we agree with the Board that the theft cannot excuse missing a deadline that had expired two weeks earlier. Besides the theft, High Country's only explanation for its late filing was that the office manager had apparently failed to docket several matters in the weeks leading up to her departure. Counsel for High Country acknowledged that "this may have been simple neglect or carelessness on her part," but also speculated that the office manager "may have acted to intentionally create exactly this type of problem for our firm." Request to Reinstate Case No. 97-2549, App. vol. 2 at 13-14. Especially in light of the fact that High Country timely filed its position paper for 1995, which was also due June 1, 1999, it was altogether reasonable for the Board to discredit High Country's hypothesis of selective sabotage. High Country is left, then, with the excuse that the office manager negligently failed to file the position paper on time – which is to say that High

Country is left with no excuse at all, since High Country's counsel is responsible for his staff's negligence. *See Inova*, 244 F.3d at 350-51 (upholding the Board's refusal to excuse a provider who missed the deadline because of an "administrative oversight"); *UHI*, 250 F.3d at 997. Rejecting High Country's excuse was far from arbitrary or capricious.

B

In High Country's second letter seeking reinstatement of its appeal, it sought to "impress upon the Board" that the dismissal was "really an exercise of 'form over substance.'" Request to Reconsider Denial of Reinstatement Request, App. vol. 2 at 3. It argued that the Board and the Intermediary had adequate notice of High Country's arguments through (1) High Country's preliminary position paper, allegedly filed on December 30, 1997, and (2) parallel arguments raised in High Country's duly filed brief concerning FYE 1995. The Board refused to reconsider, stressing that it had the power and authority to set procedural rules, and that it was High Country's responsibility to comply with those rules. High Country renews its arguments on appeal.

High Country's first argument depends on its disputed claim that it filed a preliminary position paper in 1997, well over a year before the deadline. We need not decide whether the paper was filed, however, because even assuming that it was, we reject the argument that the Board must accept a preliminary position

paper in lieu of a final one.  At the time, the Provider Reimbursement Manual

provided as follows:

> At the appropriate time, you prepare the provider's draft
> position paper and submit it to the intermediary.  Within
> 60 days the intermediary sends you its position paper.
> You then have 30 days to prepare your final position
> paper, which you send to the intermediary and to the
> Board.

PRM § 2921.4B (1993) (repealed 2000).  Thus, the Board's procedural rules

specifically contemplate two separate position papers, a preliminary one to be sent

to the intermediary, and a final one to be sent to the Board.  This two-stage

process is not optional:

> In order to assist the Board in its deliberations, you and
> the intermediary prepare separate position papers. . . .
> Each party is required to exchange position papers in
> accordance with § 2921.4 and include, in their position
> papers to the Board, a statement certifying that they
> have been exchanged.

PRM § 2921.5 (1993) (repealed 2000).  The Board's two-stage process helps

ensure that the parties clearly identify the precise nature of their dispute, and

gives the Board the benefit of adversarial testing to expose flaws in superficially

sound arguments on either side of the controversy.[5]

But if filing the preliminary position paper always satisfied the final

---

[5]The Board's new rules maintain the requirement of two separate position
papers.  *See* PRRB Instructions II(B)(I)-(II) (effective Mar. 1, 2002).

position paper requirement, there would effectively be no need to file a final position paper. A provider could always satisfy the requirements by making sure that it sent its preliminary position paper to both the Board and the fiscal intermediary (as High Country claims to have done here). Thus, to accept High Country's argument as a general matter would be tantamount to abolishing the requirement of two position papers. Because we cannot say that the requirement of a second position paper responding to the Intermediary's preliminary position paper is arbitrary and capricious, we decline to invalidate that requirement indirectly by excusing its violation. *See St. Joseph Hosp. v. Shalala*, No. 99 C 7775, 2000 WL 1847976 at *4 (N.D. Ill. Dec. 15, 2000) (rejecting an argument similar to High Country's).

Similar concerns lead us to reject High Country's argument that the final position paper was unnecessary because its arguments could be gleaned from other reimbursement appeals dealing with similar issues and from the preliminary list of issues for its appeal. The PRRB was under no duty to hunt around in the record, let alone in the records for other cases, in an attempt to discern the nature of High Country's legal claims. Even assuming that such a hunt would have provided the PRRB with the same information that would have been in the final position paper (though this seems unlikely), that does not make the Board's dismissal arbitrary or capricious.

C

High Country next argues that it did not receive proper notice of the deadline and its associated penalty (dismissal). In its initial notice of hearing, the Board set the June 1 deadline and included the following warning:

> Failure of the Provider to submit its position papers by the above deadlines will result in dismissal of the appeal. . . . NOTE: NO FURTHER REMINDER LETTER OR OTHER NOTICE WILL BE SENT REGARDING THE DEADLINES FOR POSITION PAPERS.

App. vol. 2 at 295. High Country wisely stops short of arguing that this warning was unclear. Rather, it maintains that it was entitled to have its case governed by a previous policy in effect until just days after its appeal was filed with the Board. Under that policy, the Board sent parties a letter reminding them of the relevant deadlines as the time of the hearing approached. On July 11, 1997, the Health Care Financing Administration's Office of Hearings gave notice that it was abandoning that practice:

> In the past, when the Board received a signed "List of Issues", it issued a "Notice of Hearing and Due Date for Position Papers" (Notice), which placed an appeal on a long-term calendar. The Board then sent a Reminder of Hearing/Dismissal Warning ("Reminder") letter approximately one year before the long-term calendar hearing month. *Effective immediately for all new appeals, the Board will no longer issue a separate Reminder letter.* The revised Notice now incorporates language advising that if the parties miss the position paper due dates, the Board will dismiss the case. There

will be no reminders.

HCFA Office of Hearings Letter to Parties to PRRB Appeals (July 11, 1997), Supp. App. to Appellant's Reply Br. 1 (emphasis added).

In its Reply Brief, High Country claims that because it filed its appeal on July 2, the appeal was not a "new appeal" as of July 11, so the agency acted arbitrarily and capriciously in applying the new policy to it. We cannot agree. As a textual matter, it is far from obvious that an appeal becomes an "old appeal" before it is put on the calendar, especially on a docket in which hearings are scheduled years after the appeal is filed. We think a more natural reading of the announcement is that going forward, the Office of Hearings would give the warning of dismissal in the initial scheduling letter instead of in a separate reminder letter. The most plausible reason for continuing to send reminder letters in "old appeals" is that the parties in those appeals had not been adequately warned of the new procedures in their initial scheduling letter. As noted, High Country received this warning, and thus was on notice that it would not receive a reminder. Because there was no reason to refrain from applying the new policy in appeals, like High Country's, that were already filed but not scheduled, we hold that it was reasonable for the Board to treat such appeals as "new appeals" governed by the new policy.

The same considerations dispose of High Country's related claim, based on

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988), that the change in policy was impermissibly retroactive. In *Georgetown*, a unanimous Supreme Court held that the Medicare Act did not give the Secretary of Health and Human Services authority to change the substantive standards governing which costs could be reimbursed after those costs were already incurred. The retroactive change in *Georgetown* was troublesome because the providers could not "know in advance the limits to Government recognition of incurred costs," and so had no "opportunity to act to avoid having costs that [were] not reimbursable." *Id.* at 214 (quoting H.R. Rep. 92-231, at 83 (1971)). As Justice Scalia pointed out, this kind of retroactive change to the law governing past conduct is entirely different from a prospective change to the law that has future effects on arrangements made in the past. *See id.* at 220 (Scalia, J., concurring) ("[T]here is no question that the Secretary could have applied her new wage-index formulas to respondents in the future, even though respondents may have been operating under long-term labor and supply contracts negotiated in reliance upon the pre-existing rule."). The no-reminder policy was "retroactive" only in this second, weaker sense: although it was applied to appeals that had been filed before the change, it set prospective standards for the treatment of those appeals after July 11. Nothing about the change affected the standards applicable to High Country's actions previous to July 11. Therefore, we see no *Georgetown* violation.

D

Next, High Country weakly attempts to show that the PRRB has not applied its deadline consistently. Its attempt fails. All but one of the cases it cites are simply directions to reinstate dismissed cases pursuant to settlement agreements. *See* Pinnacle Care Corp., Medicare & Medicaid Guide (CCH) ¶ 80,310 (HCFA Adm'r Feb. 18, 1999); Rose Care Center–Swansea, Medicare & Medicaid Guide (CCH) ¶ 80,309 (HCFA Adm'r May 12, 1999); White Mem'l Hosp., Medicare & Medicaid Guide (CCH) ¶ 80,308 (HCFA Adm'r May 11, 1999). Such settlement agreements have no precedential weight, and the mere fact that the Secretary has settled other cases does not make it arbitrary and capricious for him not to settle this one. The one actual decision cited by High Country was decided under a standard considerably more liberal than the one that applied to High Country's appeal; that standard allowed dismissal "if it becomes evident that the provider has abandoned its intention to have a hearing in the dispute." Anaheim Gen. Hosp., Medicare & Medicaid Guide (CCH) ¶ 40,709 (HCFA Adm'r May 22, 1992) (quoting the version of PRM § 2924.4 then in effect). By contrast, High Country was governed by the standard set forth in the 1993 version of the PRM, which threatened dismissal for a provider's failure to meet a deadline regardless of whether the provider intended to abandon the appeal. *See* PRM § 2921.4E (1993). Because High Country does not cite a single decision in which the

-16-

Board's policy was not applied to someone in a similar situation to its own, it has failed to call into question the Board's evenhanded application of its own procedural rules.

E

Finally, High Country repeatedly brings up its underlying complaints against the Intermediary, arguing that the Intermediary violated various procedural rules when it originally reopened the 1994 determination, and that the Intermediary was collaterally estopped from proceeding with that reopening once High Country prevailed on its 1993 claim in federal district court. These arguments largely go to the merits, and given that the only final decision by the Board is a dismissal for untimeliness, we have no occasion to consider the merits of High Country's underlying claims here. *See Good Samaritan Hosp. Reg'l Med. Ctr. v. Shalala*, 85 F.3d 1057, 1062 (2d Cir. 1996); *cf. Michigan Dep't of Envtl. Quality v. EPA*, 318 F.3d 705, 708-09 (6th Cir. 2003).

Perhaps High Country can be read generously to argue that because the Intermediary violated its procedural rules in reopening the cost report, there is inequitable conduct estopping the Board from dismissing the appeal. But that contention, too, must fail. It may be true that *the Board* cannot ignore its rules and then arbitrarily hold High Country to the letter of the law. But it would eviscerate the procedural rules of any appellate tribunal, including the Board, if

error or inequity *below* precluded the tribunal from enforcing those rules. The Board could have heard all of High Country's complaints about the Intermediary's procedural and substantive mistakes if they had been timely presented, and when they were not, the Board was under no obligation to consider the merits before dismissing the claims on procedural grounds. *See St. Joseph's Hosp.*, 2000 WL 1847976 at 4 ("The Hospital missed a deadline, and its case was dismissed. We do not find that the Board was under any obligation to consider any other facts.").

CONCLUSION

For the foregoing reasons, the decision of the district court is AFFIRMED.