**IHG HEALTHCARE d/b/a Grace Hospice of Texas, Plaintiff,**

v.

**Kathleen SEBELIUS, Secretary of United States Department of Health and Human Services, Defendant.**

Civil Action No. H–09–3233.

United States District Court,
S.D. Texas.

June 13, 2010.

Brian M. Daucher, Sheppard Mullin et al., Costa Mesa, CA, Lindsay L. Lambert, Hughes Watters et al., Houston, TX, for Plaintiff.

Kevin C. Aiman, U.S. Attorney's Office, Houston, TX, for Defendant.

### Order

LYNN N. HUGHES, District Judge.

On May 7, 2010, Magistrate Judge Stephen Wm. Smith issued a memorandum and recommendation (45). The plaintiff (49) and defendant (48) objected. The memorandum and recommendation is adopted as this court's order.

### Final Judgment

In accordance with the Memorandum and Recommendation (45) adopted this day, it is hereby ORDERED:

1. Grace's claim for reimbursement of its Fiscal Year 2006 medicare cap repayment is denied;

2. 42 C.F.R. § 418.309(b)(1) is unlawful and is hereby set aside;

3. The challenged hospice cap repayment demand to Grace for fiscal year 2007 is set aside;

4. HHS is enjoined from this day forward from enforcing against Grace any repayment demand pursuant to 42 C.F.R. § 418.309(b)(1). The prior stay (40) entered in this case is vacated and replaced by this permanent injunction;

5. This case is remanded to HHS for recalculation of the amount of Grace's 2007 medicare cap repayment obligation in accordance with 42 U.S.C. § 1395f(i)(2);

6. Funds previously collected by HHS for Grace's 2007 medicare cap repayment obligation shall be credited towards payment of the recalculated medicare repayment obligation. Any funds previously collected by HHS in excess of the recalculation shall be returned promptly to Grace with interest pursuant to 42 U.S.C. § 1395oo (f)(2).

7. This court retains jurisdiction to consider any application for an award of costs and attorneys' fees.

## MEMORANDUM AND RECOMMENDATION

STEPHEN WM. SMITH, United States Magistrate Judge.

This case challenges the facial validity of a payment cap regulation for hospice care under the Medicare Act. Plaintiff IHG Healthcare, Inc. d/b/a/ Grace Hospice of Texas (Grace) seeks judicial review of agency action upholding two repayment demands (covering fiscal years 2006 and 2007) issued by defendant Kathleen Sebelius, Secretary of United States Department of Health and Human Services (HHS). According to Grace, the HHS repayment demands are invalid because they were calculated pursuant to a regulation, 42 C.F.R. § 418.309(b)(1), which directly contradicts the Medicare Act.

Several dispositive motions are before the court. HHS has filed a Rule 12(b)(1) motion seeking to dismiss Grace's FY 2006 challenge for lack of subject matter jurisdiction (Dkt. 9). The parties have also filed cross-motions for summary judgment on the validity of the challenged HHS regulation (Dkts. 14, 25). The motions have been fully briefed by the parties, and oral argument was heard on February 23, 2010.

The court recommends that (1) Grace's 2006 fiscal year claim be denied because the Provider Reimbursement Review Board (PRRB) properly rejected it on procedural grounds; (2) Grace's 2007 fiscal year claim be sustained because the HHS hospice cap regulation is invalid; (3) a permanent injunction issue against future application of the invalid regulation to Grace; and (4) Grace's 2007 fiscal year claim be remanded to HHS for calculation according to the statute.

### Background

Grace is a Medicare certified hospice provider in Houston, Texas. The federal government pays Grace pursuant to the Medicare program established under Title XVIII of the Social Security Act (the Medicare Act). HHS administers the program and reimburses hospices, like Grace, on a per diem basis for services rendered to Medicare beneficiaries. Total annual payments to hospices are subject to an aggregate annual provider cap. *See* 42 U.S.C. § 1395f(i)(2). Any provider whose annual revenues from Medicare exceed its cap is subject to a demand from HHS for repayment of the difference.[1] HHS demanded repayment from Grace in the amounts of $730,749 for Medicare fiscal year 2006 and $1,374,496 for 2007. Grace contends these demands, calculated under HHS regulation 42 C.F.R. § 418.309(b)(1), are overstated.

Grace has already repaid the 2006 demand, and was making monthly payments

---

1. A fiscal "intermediary" (typically a private insurance company acting as the Secretary's agent) analyzes the cost report submitted by a provider and issues a Notice of Program Reimbursement (NPR) setting the reimbursement amount to which a provider is entitled for the year. *Your Home Visiting Nurse Servs. v. Shalala,* 525 U.S. 449, 450–51, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999)(citing 42 C.F.R. §§ 405.1801(b) and 405.1803).

of approximately $30,000 per month on the 2007 demand at the time suit was filed. On March 29, 2010, Grace received HHS's repayment demand for 2008. Grace was then able to show that the combined 2007 and 2008 repayment obligations would cause it irreparable harm, and the court granted Grace's motion to stay enforcement of the 2007 and 2008 repayment demands (Dkt. 40). Grace has not yet exhausted its administrative challenge to the 2008 demand, but the issues are identical and this court's ruling as to the 2008 demand would be the same as for 2007.

Grace alleges that the HHS hospice cap regulation is facially invalid because it contradicts the Medicare Act, specifically 42 U.S.C. § 1395f(i)(2)(C). Grace seeks a declaration that the regulation is invalid, an injunction against its enforcement, and a remand to HHS for calculation of reimbursements due under the method mandated by statute.

### Analysis

Before addressing the merits of Grace's regulatory challenge, it is necessary to consider certain preliminary issues concerning Grace's FY 2006 claim which, unlike its FY 2007 claim, was not timely presented to the agency below.

### A. The FY 2006 Claim

#### 1. Does the court have subject matter jurisdiction?

A provider dissatisfied with an NPR may obtain a hearing before the PRRB if the amount in controversy is over $10,000 and a request for hearing is filed within 180 days after notice of program reimbursement. 42 U.S.C. § 1395oo(a)(1). A provider is entitled to judicial review of any final decision of the PRRB. 42 U.S.C. § 1395oo(f)(1).

It is undisputed that Grace did not timely file its request for hearing before the PRRB within 180 days of receiving its NPR for 2006. When it did file such a request, it asked to PRRB to grant leave to file a late appeal for good cause pursuant to 42 C.F.R. § 405.1836. The PRRB denied leave, citing 42 C.F.R. § 405.1836(b) and (c), which provide that good cause may be found only in extraordinary circumstances, and that a change in law does not constitute good cause. The PRRB expressly informed Grace that judicial review of its denial of leave was available.[2] Nevertheless, HHS moves for dismissal on grounds that this court lacks subject matter jurisdiction over the FY 2006 claim because of Grace's untimely request for hearing.

In analyzing defendant's Rule 12(b)(1) motion, the court is mindful of repeated Supreme Court admonitions to heed the critical distinction between "true jurisdictional conditions" and "claim-processing rules." *See Reed Elsevier, Inc. v. Muchnick,* —— U.S. ——, 130 S.Ct. 1237, 1244, 176 L.Ed.2d 17 (2010) ("Our recent cases evince a marked desire to curtail such 'drive-by jurisdictional rulings,'" citing *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 511, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); *Kontrick v. Ryan,* 540 U.S. 443, 456, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004)). The general approach to distinguish jurisdictional conditions from claim-processing requirements was described in *Arbaugh:*

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

546 U.S. at 515–16, 126 S.Ct. 1235 (internal footnote and citation omitted).

**2.** September 24, 2009 PRRB determination

(Dkt. 9–1).

The issue in *Arbaugh* was whether Title VII's employee numerosity requirement set a threshold for federal court jurisdiction, as opposed to a substantive element of a Title VII claim. Because the numerosity requirement was not clearly labeled as jurisdictional, did not appear in Title VII's jurisdiction-granting section, and had never before been construed by the Supreme Court as jurisdictional, the Court concluded that it could not fairly be read to "speak in jurisdictional terms or in any way refer to the jurisdiction of the district courts." *Id.* at 515, 126 S.Ct. 1235 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (holding that Title VII's 180–day charge filing requirement was not a jurisdictional prerequisite to suit)).

The Supreme Court adhered to this approach most recently in *Reed*, finding that the Copyright Act's registration requirement was a precondition to filing an infringement suit that did not limit the subject matter jurisdiction of a district court. Writing for the Court, Justice Thomas explained:

> A statutory condition that requires a party to take some action before filing a lawsuit is not automatically "a *jurisdic-*

*tional* prerequisite to suit." *Zipes*, 455 U.S. at 393, 102 S.Ct. 1127 (emphasis added). Rather, the jurisdictional analysis must focus on the "legal character" of the requirement, *id.*, at 395, 102 S.Ct. 1127, which we discerned by looking to the condition's text, context, and relevant historical treatment, *id.* at 393–95, 102 S.Ct. 1127; .... We similarly have treated as nonjurisdictional other types of threshold requirements that claimants must complete, or exhaust, before filing a lawsuit.

130 S.Ct. at 1246–47 (one internal footnote and citation omitted). Because the registration requirement in 17 U.S.C. § 411(a) "imposes a precondition to filing a claim that is not clearly labeled jurisdictional, is not located in a jurisdiction-granting provision, and admits of congressionally authorized exceptions," it was ruled nonjurisdictional. *Id.* at 1247.

■ The threshold requirement urged here as a jurisdictional bar by HHS fits the same mold as those considered and rejected by *Reed* and *Zipes*. Section 1395*oo*(a) allows a provider to obtain a hearing before the PRRB with respect to a cost report if, among other things, the provider files a request for a hearing within 180 days of receipt of the NPR.[3] Noth-

---

3. a) Establishment

Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board (hereinafter referred to as the "Board") which shall be established by the Secretary in accordance with subsection (h) of this section and (except as provided in subsection (g)(2) of this section) any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within such time as the Secretary may require in order to make payment under such section may obtain a hearing with respect to such payment by the Board, if—

(1) such provider—
(A)(i) is dissatisfied with a final determination of the organization serving as its fiscal intermediary pursuant to section 1395h of this title as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report, or
(ii) is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title,
(B) has not received such final determination from such intermediary on a timely basis after filing such report, where such report complied with the rules and regula-

ing in § 1395oo(a) pins a jurisdictional label on this requirement; indeed the entire provision is crickets on judicial review.

Likewise, the jurisdiction-granting provision of the Medicare Act invoked by Grace, 42 U.S.C. § 1395oo(f)(1), does not mention the 180–day hearing request requirement. That provision reads in pertinent part:

A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received....

42 U.S.C. § 1395oo(f)(1).

This provision essentially imposes two prerequisites for judicial review of Board actions: (1) commencing a civil action within 60 days of (2) a final decision of the Board. Both are met here. Grace timely commenced this action within the 60 day period. The ruling was certainly a "decision" of the Board; as if to dispel any doubt, it was helpfully captioned "Decision of the Board."[4] And the decision was by statutory definition[5] "final," because the Secretary never reversed, affirmed, or modified it. Nothing in the statute suggests that only a certain *type* of Board decision can be final, such as a ruling on the merits, or a ruling after a hearing.[6] Thus, based upon its text and context, the timely hearing request requirement of § 1395oo(a) cannot be regarded as anything other than a claim-processing rule.

This interpretation is bolstered by the defendant's own regulations, which allow for a good cause exception to the 180 day request period. 42 C.F.R. § 405.1836(a). Such an exception indicates that the agency itself does not view the statutory 180–day period as a limit on the Board's own jurisdiction. *Cf. Reed*, 130 S.Ct. at 1246 & n. 5 ("It would be at least unusual to ascribe jurisdictional significance to a condition subject to these sorts of exceptions."). Finally, treating the time period as a claim-processing rule is not inconsistent with historical practice, because a ma-

tions of the Secretary relating to such report, or

(C) has not received such final determination on a timely basis after filing a supplementary cost report, where such cost report did not so comply and such supplementary cost report *did so comply*,

(2) the amount in controversy is $10,000 or more, and

(3) such provider files a request for a hearing within 180 days after notice of the intermediary's final determination under paragraph (1)(A)(i), or with respect to appeals under paragraph (1)(A)(ii), 180 days after notice of the Secretary's final determination, or with respect to appeals pursuant to paragraph (1)(B) or (C), within 180 days after notice of such determination would have been received if such determination had been made on a timely basis.

42 U.S.C. § 1395oo(a).

**4.** Dkt. 9–1, at 2. Defendant's own brief adopts the same characterization. Dkt. 9, at 13 ("The Board ultimately **decided** that the basis for the extension request was the change in the law ....") (emphasis added).

**5.** *See* 42 U.S.C. § 1395oo (f)(1), sentence one.

**6.** *Compare* section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), which limits judicial review to "any final decision of the Commissioner of Social Security made after a hearing to which [the plaintiff] was a party." As the Supreme Court observed in *Califano v. Sanders*, "[t]his provision clearly limits judicial review to a particular type of agency action" 430 U.S. 99, 108, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

jority of federal appellate courts have agreed that district courts have jurisdiction to review such procedural dismissals by the PRRB. *See High Country Home Health, Inc. v. Thompson,* 359 F.3d 1307, 1310 (10th Cir.2004); *UHI, Inc. v. Thompson,* 250 F.3d 993, 996 (6th Cir.2001); *Inova Alexandria Hosp. v. Shalala,* 244 F.3d 342, 347 (4th Cir.2001); *Edgewater Hosp., Inc. v. Bowen,* 857 F.2d 1123, 1130–31 (7th Cir.1988); *Western Medical Enter., Inc. v. Heckler,* 783 F.2d 1376, 1380 (9th Cir. 1986); *Athens Comm. Hosp., Inc. v. Schweiker,* 686 F.2d 989, 993 (D.C.Cir. 1982).

Under the *Arbaugh* analysis then, the 180–day limit of § 1395oo(a) is a claim processing rule that poses no constraint on subject matter jurisdiction in federal court. Defendant resists this conclusion on several grounds, none persuasive.

First, defendant argues that "[i]f the PRRB lacks jurisdiction, so does the district court." [7] But this is a fallacy, both in logic and in law. "Jurisdiction" refers to "a court's adjudicatory authority." *Kontrick v. Ryan,* 540 U.S. 443, 455, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004). Appellate courts routinely review lower court dismissals for want of jurisdiction. The mere fact that a lower court or agency may decide it lacks jurisdiction over a case does not rob a reviewing court of adjudicatory authority, thereby shielding the jurisdictional ruling from further review. Of course, the decision under review is not the merits of the underlying claim, but rather the Board's refusal to decide the merits. *See Your Home Visiting Nurse*

*Services v. Shalala,* 525 U.S. 449, 452–56, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999) (reviewing and affirming PRRB dismissal of provider appeal on jurisdictional grounds); *Bethesda Hospital Ass'n v. Bowen,* 485 U.S. 399, 401, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988) (reviewing and reversing PRRB decision that it lacked jurisdiction to consider provider's challenge to agency regulation).

Second, the defendant argues that Grace's failure to exhaust administrative remedies as to its 2006 claim precludes subject matter jurisdiction over those claims. Again, this argument misses the mark, because the decision under review is not the merits of the 2006 claim, but the PRRB decision to deny the good cause exception. Grace raised that issue before the PRRB, and received a negative decision. There is no further administrative remedy available to challenge that decision, and so resort to federal court is not premature.

Third, the defendant argues that "there is no final agency decision within the meaning of 42 U.S.C. §§ 405(g) and 1395oo(f) for this Honorable Court to review." [8] For reasons already explained, the Board's decision meets the definition of a "final" decision under § 1395oo(f)(1), because it was never reversed, affirmed, or modified by the Secretary. The reference to § 405(g) is misplaced, because that section deals with judicial review of decisions by the Commissioner of Social Security, and contains materially different language from § 1395oo(f)(1). [9] Unlike other portions of the Social Security Act, this provision was *not* incorporated into the Medicare Act, *see* 42 U.S.C. § 1395ii, and so it has no relevance here. [10]

---

7. Dkt. 9, at 10.

8. Dkt. 9, at 13.

9. "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g).

10. HHS argues that, despite its omission from the list of incorporated provisions in § 1395ii

■ Finally, the defendant relies on its own regulation, which purports to strip the courts of power to review a Board finding on a good cause claim. 42 C.F.R. § 405.1836(e)(4) ("A finding by the Board or the Administrator that the provider did or did not demonstrate good cause for extending the time for requesting a board hearing is not subject to judicial review."). This regulation is apparently of recent vintage (2008), and its validity has not yet been tested, so far as the court is aware. Any agency regulation must of course conform to the statute that gives it birth. *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir.2007) ("The authority of administrative agencies is constrained by the language of the statute they administer.").

This jurisdiction-stripping regulation flouts the statute. As previously observed, the statute does not limit the *type* of Board decisions subject to court review, so long as the decision is "final." Congress defined that term in the first sentence of § 1395oo(f)(1) with rare unequivocation: "A decision of the Board **shall be final** unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision." (Emphasis added). Contrary to the statute, the regulation purports to shield from judicial review a certain type of final Board decision—good cause filing extensions. Because the regulation carves out an exception to the statutory mandate of judicial review for all final Board decisions, and cannot reasonably be construed otherwise, it is a nullity.

The Fifth Circuit decision cited by HHS, *Harper v. Bowen*, 813 F.2d 737, 743 (5th Cir.1987), is not to the contrary. That case involved the scope of judicial review under the materially different provisions of the Social Security Act, 42 U.S.C. § 405(g). Because § 405(g), unlike § 1395oo(f)(1), does not define the term "final decision," its meaning "is left to the Secretary to flesh out by regulation." *Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). As explained above, the Medicare Act did not incorporate § 405(g), and its judicial review section contains no bare bones in need of regulatory fleshing out.

The court concludes that Grace has met its burden to establish subject matter jurisdiction to review the PRRB's denial of leave for a late appeal. Therefore, defendant's partial motion to dismiss for lack of subject matter jurisdiction should be denied.

## 2. Was the PRRB denial of leave arbitrary or capricious?

Judicial review of the PRRB's decision is governed by 42 U.S.C. § 1395oo(f), which incorporates the standard of review of the Administrative Procedure Act *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Under that standard, a court must uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2)(A); *see Western Medical Enter., Inc. v. Heckler*, 783 F.2d 1376, 1381

§ 405(g) should be added to that list by virtue of Supreme Court dictum in *Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 10, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) ("Section 405(h) purports to make exclusive the judicial review method set forth in § 405(g)."). Read in context, this statement merely describes the relation of these two provisions within the Social Security Act. The issue at hand was whether § 405(h), as expressly incorporated by § 1395ii, barred federal question jurisdiction over a nursing home Medicare claim. The Court did not decide whether § 405(g) had also been incorporated into the Medicare Act by implication, and had no need to consider that issue in reaching its decision.

(9th Cir.1986). Although technically not presented by defendant's Rule 12(b)(1) motion, which attacked only subject matter jurisdiction, this issue has been briefed by the parties[11] and there are no disputed fact questions for which additional evidence is necessary. Judicial efficiency warrants a ruling at this time.

The PRRB denied Grace leave to file its untimely appeal for 2006, applying its "good cause" regulation. 42 C.F.R. § 405.1836.[12] That regulation describes the circumstances under which the PRRB will extend the time limit for filing an appeal. It permits the Board to find good cause where there are extraordinary circumstances beyond the provider's control, such as a natural or other catastrophe, fire or strike. At the same time, the regulation provides that the Board may not grant an extension when the provider "relies on a change in the law ... whether based on a court decision or otherwise." *Id.* at § 405.1836(c)(1). The Board denied Grace's request on this ground.[13]

Grace does not directly challenge the PRRB's decision as a misapplication of the "good cause" regulation; instead it relies upon the judicially-created doctrine of equitable tolling, which it contends should also govern the PRRB's good cause determination. It is questionable whether equitable tolling is applicable in situations such as this, where the agency has promulgated a regulation to govern its own discretion to extend a time limit. Even assuming the doctrine of equitable tolling were available, however, Grace's argument does not fit into any of the recognized categories in which tolling has been granted by courts.

In 1990, the Supreme Court reversed a long-standing principle that equitable tolling was never available in suits against the government. *Irwin v. Dept. of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (equitable tolling of time limits under Title VII). *Irwin* reasoned that when Congress decides to waive sovereign immunity, the presumption is that equitable tolling rules apply as they would against any private litigant, unless Congress intended otherwise. *See United States v. Brockamp,* 519 U.S. 347, 350–51, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997) (holding that Internal Revenue Code provision should not be read as containing implicit exceptions); *Perez v. United States,* 167 F.3d 913, 919 (5th Cir.1999) ("Absent evidence to the contrary, equitable tolling can be applied against the government.").

However, as the Fifth Circuit has emphasized, equitable tolling "is not [a doctrine] that trial courts have discretion to

---

**11.** Dkt. 9, at 11–13; Dkt. 23, at 13–18.

**12.** 42 C.F.R. § 405.1836 reads in pertinent part:

(b) The Board may find good cause to extend the time limit only if the provider demonstrates in writing it could not reasonably be expected to file timely due to extraordinary circumstances beyond its control (such as a natural or other catastrophe, fire, or strike), and the provider's written request for an extension is received by the Board within a reasonable time (as determined by the Board under the circumstances) after the expiration of the applicable 180–day limit specified in § 405.1835(a)(3).

(c) The Board may not grant a request for an extension under this section if—
(1) The provider relies on a change in the law, regulations, CMS Rulings, or general CMS instructions (whether based on a court decision or otherwise) or a CMS administrative ruling or policy as the basis for the extension request; or
(2) The date of receipt by the Board of the provider's extension request is later than 3 years after the date of the intermediary or other determination that the provider seeks to appeal.

**13.** Dkt. 9–1, at 3.

use whenever they please." *Perez*, 167 F.3d at 919. The Supreme Court in *Irwin* outlined the contours of the doctrine. While a late filing will not be permitted in cases of excusable neglect or lack of due diligence, equitable tolling is generally appropriate in two types of circumstances:

> We have allowed equitable tolling in situations where a plaintiff has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.

498 U.S. at 96, 111 S.Ct. 453 (footnotes omitted).

■ Neither situation is present here. Grace admittedly filed no request of any kind during the statutory period for the 2006 fiscal year claim. This is not a case where the claimant timely filed in the wrong court, *Burnett v. New York Central R.R. Co.*, 380 U.S. 424, 429, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), or presented the claim to the right entity but in the wrong capacity. *Perez*, 167 F.3d at 918.

Nor is this a case where Grace was induced or tricked by HHS into missing the deadline. Grace points to a summary judgment issued by an Oklahoma district court in February 2008, declaring the same hospice care regulation at issue here to be facially invalid, and contends that HHS acted improperly by continuing to apply the regulation without notice of the adverse ruling to hospice care providers such as Grace. *See Sojourn Care, Inc. v. HHS*, 07–CV–375, slip op. (N.D.Okla. Feb. 13, 2008). But HHS did nothing improper by continuing to enforce the regulation elsewhere while that case was pending.[14] Although there is authority for the proposition that a district court has authority to issue a nationwide injunction against enforcement of a facially invalid regulation,[15] the *Sojourn* court never issued such an injunction. The facial invalidity ruling in *Sojourn* came only in an oral, interlocutory summary judgment ruling. Like any other litigant, HHS was entitled to pursue its defense through final judgment and appeal. Indeed, the court denied Sojourn's motion for entry of judgment and injunction in a subsequent written order issued March 3, 2009.[16]

Furthermore, all the facts necessary to make a challenge to the regulation were as available to Grace as they were to Sojourn Care. Grace could have acted independently to challenge the offending regulation, even without knowledge of the February 2008 ruling in *Sojourn*. Nothing HHS did or failed to do prevented Grace from filing its 2006 appeal on time.

The PRRB's decision that Grace's circumstances did not constitute good cause for its late filing under 42 C.F.R. § 405.1836(a) was not arbitrary, capricious, or contrary to law. Thus, the court finds no basis to reverse the PRRB's decision to dismiss Grace's late appeal of the FY 2006 NPR.

## B. The FY 2007 Claim

There are no factual disputes on the record in this case. The parties' cross-motions present purely legal questions that are appropriate for summary judg-

---

**14.** The FY 2006 repayment demand was dated March 19, 2008 (Dkt. 9–2).

**15.** *See Nat'l Mining Ass. v. U.S. Army Corps of Eng.*, 145 F.3d 1399, 1409 (D.C.Cir.1998)

**16.** *Sojourn*, Case No. 07–CV–375, slip op. at 7 (Mar. 3, 2009) ("Therefore, plaintiff is not entitled to judgment or injunctive relief. The court believes the proper course of action at this stage is to remand the case to HHS for further proceedings to determine whether, and to what extent, plaintiff has been injured by application of the regulation at issue.") (Dkt. 11–1).

ment under Rule 56. In its motion for summary judgment, HHS contends: (1) that Grace has not established the amount in controversy ($10,000), and (2) that 42 C.F.R. § 418.309(b)(1) is a reasonable interpretation of an ambiguous federal statute.

### 1. Does the amount in controversy exceed $10,000?

In order for a Medicare provider to obtain a hearing before the PRRB, the amount in controversy must exceed $10,000. *See* 42 U.S.C. § 1395oo(a)(2). The PRRB, upon reviewing Grace's 2007 claim, expressly found that "[t]he documentation shows that the estimated amount in controversy exceeds $10,000." [17] Nevertheless, HHS now challenges this finding by its own agency as a mere "assumption," and worries that "it is possible that the amount in controversy requirement is not satisfied." To guard against that possibility, HHS asks this court to remand the case to the PRRB for fact-finding on the precise amount of Medicare payments due to Grace under its legal theories.

■ HHS's proposal upends the usual protocol for determining jurisdictional facts. When the amount in controversy is put in issue, a federal court generally asks whether it is facially apparent from the complaint that a plaintiff seeks recovery in an amount greater than the jurisdictional minimum. *See Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1336 (5th Cir.1995); *Hartford Ins. Group v. Lou–Con, Inc.*, 293 F.3d 908, 910 (5th Cir.2002). Of course this is not a diversity case. The source of this court's jurisdiction is the Medicare Act. *Cf. Your Home Visiting Nurse Serv., Inc. v. Shalala*, 525 U.S. 449, 456, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999). But the court can find no reason, or authority, for requiring the PRRB to undertake more arduous fact-finding in evaluating its jurisdiction than this court does when evaluating its own subject matter jurisdiction. The PRRB expressly ruled that Grace met the amount in controversy requirement. The bare "possibility" that the PRRB may have made a mistake is no warrant for this court to reverse that decision.[18]

HHS's proposed procedure has nothing to recommend it from the standpoint of judicial efficiency. It requires: (1) exhaustion before the PRRB; (2) filing in federal court; (3) remand to the PRRB; (4) re-submission to federal court; and (5) remand to the PRRB to fashion an ultimate remedy. Surely this would "convert judicial review of agency action into a ping-pong game." *Morgan Stanley Cap. Group, Inc. v. Pub. Util. Dist. 1 of Snohomish Cty.*, 554 U.S. 527, 128 S.Ct. 2733, 2745, 171 L.Ed.2d 607 (2008); *see also Tri–County Hospice, Inc. v. Sebelius*, case nos. 08–273, 09–407, —— F.Supp.2d ——, ——, 2010 WL 784836 at *2 (E.D.Okla.

---

**17.** Grace's Ex. H (Dkt. 14–1).

**18.** In advocating remand for jurisdictional fact-finding, HHS primary relies upon *Autumn Bridge, L.L.C. v. Sebelius*, Case No. CIV–08–819–F, slip. op. (W.D.Okla. Aug. 10, 2009) (Dkt. 32–1) and *Autumn Bridge, L.L.C. v. Sebelius*, Case No. CIV–09–1290–F, slip. op. (W.D.Okla. Mar. 5, 2010) (Dkt. 38). The court does not share that court's concern that the administrative record must include definitive determination of Grace's economic damages before it can determine whether Grace has Article III standing. More persua-

sive is the recent decision in *Lion Health,* in which the court dispensed with HHS's amount in controversy argument in a footnote, holding "[t]he court reads the above quoted language [of § 1395oo (f)(1) ] to mean that the court's subject matter jurisdiction is based on a determination by the PRRB that it lacks authority to decide the question presented by plaintiff's appeal. Such determinations were rendered in this case. The court sees no reason why it should review the PRRB's determination of its own authority at this time." *Lion Health,* 689 F.Supp.2d at 855, n. 6 (N.D.Tex.2010) (Dkt. 35–1).

Mar. 8, 2010) (a remand to determine damages "renders nugatory the word 'expedited' in EJR"). HHS's motion for summary judgment on this ground should be denied.

### 2. Is 42 C.F.R. § 418.309(b)(1) consistent with the Medicare Act?

■ Having dispensed with preliminaries, we arrive at the crux of this case—whether HHS's hospice cap regulation, 42 C.F.R. § 418.309(b)(1), complies with the section of the Medicare Act it purports to implement, 42 U.S.C. § 1395f(i)(2).

In 1982, Congress amended Medicare to provide a hospice benefit for end-of-life care to terminally ill patients. HHS reimburses hospices such as Grace on a per diem basis for services rendered to eligible Medicare beneficiaries. An individual beneficiary may remain in hospice care for an unlimited number of days, so long as a physician has certified the individual as terminally ill with a life expectancy of six months or less.

Total payments to a hospice provider in any fiscal year may not exceed an aggregate cap, calculated as the product of the individual cap allowance (adjusted annually for inflation) times the "number of Medicare beneficiaries" in the hospice program in a given accounting year. 42 U.S.C. § 1395f(i)(2)(A).

Recognizing that beneficiaries may receive hospice care spanning two (or more) years of service, the Medicare Act directs HHS to make a proportional allocation of each beneficiary's cap allowance across years of service. Specifically, Congress mandated that the "number of Medicare beneficiaries" in an accounting year for cap purposes must be adjusted to reflect the proportion of hospice care that each patient received in different years:

> (C) For purposes of subparagraph (A), the "number of Medicare beneficiaries" in a hospice program in an accounting year is equal to the number of individu-

als who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, *such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year* or under a plan of care established by another hospice program.

42 U.S.C. § 1395f(i)(2)(C) (emphasis added).

In 1983, when HHS issued its proposed regulation to implement the hospice cap, it acknowledged that Congress mandated a proportional allocation:

> The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice.

48 Fed. Reg. 38146 at 38158 (Aug. 22, 1983). Even so, HHS declared that it would not comply with the proportional adjustment mandate. Instead, HHS proposed a regulation that would count the beneficiary only in the reporting period where the beneficiary would be expected to receive the most hospice care:

> With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary only in the reporting year in which the preponderance of the hospice care would be expected to be furnished *rather than attempt to perform a proportional adjustment.*

*Id.* (emphasis added). HHS realized that its regulation was not what Congress ordered, but candidly justified its disregard on the grounds that the statutory adjustment would be "difficult" and "burdensome":

Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted "to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . ." such an adjustment would be *difficult* in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits. We believe the proposed *alternative* of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute *without being burdensome.*

*Id.* (emphasis added).

The hospice cap regulation as finally issued essentially counted hospice care beneficiaries based on the date they elected to receive hospice care, as opposed to the portion of hospice care actually provided in that year;

Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes—

**(1) Those Medicare beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24, from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).**

42 C.F.R. § 418.309(b)(1) (emphasis added). According to HHS, the 35–day offset from the accounting year was based on the estimated average hospice stay per beneficiary, and would therefore allocate beneficiaries to the accounting year which, on aggregate, they would likely receive the preponderance of hospice care. In other words, the election date was used as a proxy for the proportional allocation mandated by the statute.

When reviewing an agency's construction of a statute, courts apply the two-step analysis established by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under step one, where "Congress has directly spoken to the precise question at issue," we must "give effect to the unambiguously expressed intent of Congress" and reverse an agency interpretation that does not conform to the plain meaning of the statute. *Id.* at 842–43, 104 S.Ct. 2778. If the statute is silent or ambiguous as to the question at issue, we proceed to the second step of the *Chevron* analysis. Under this second step, if the decision is based on a reasonable interpretation of the statute, the court defers to the agency unless its action is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778; *Texas Coalition of Cities for Utility Issues v. F.C.C.* 324 F.3d 802, 807 (5th Cir.2003).

Grace argues, persuasively, that Congress has spoken directly to the precise question at issue—that the "number [of Medicare beneficiaries be] reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year." HHS now claims there is inherent ambiguity in this passage, singling out key words of the operative clause—the verb "reflect" and the object of that verb, "proportion." [19]

---

**19.** Dkt. 25, at 17–18.

But as Learned Hand reminded us, "Words are not pebbles in alien juxtaposition; they have a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their meaning from the setting in which they are used...."[20] Read as a whole, the statutory directive is unmistakable. A proportional allocation is required based on the hospice care that "each such individual was provided" in different accounting years. A proxy filing date is not an acceptable substitute.

Contrary to its current litigation posture, HHS made no pretense in 1983 that its regulation was designed to interpret ambiguous statutory language. HHS knew full well that the statute commanded a proportional allocation, but sought to avoid that command by proposing an "alternative" that was less "difficult" and "burdensome." Ironically, at oral argument counsel for HHS admitted that recent technological advances have made the statutory allocation across multiple years of hospice care much easier to do.[21] Thus, neither the current nor the past excuse offered by HHS for noncompliance holds water.

The validity of 42 C.F.R. § 418.309(b)(1) has been, and is currently, the subject of numerous other lawsuits by hospice providers across the country. *See, e.g., Sojourn Care of Tulsa v. Sebelius,* Case No. 07–CV–375 (N.D.Okla. Mar. 3, 2009)(ex. 2 to Dkt. 15); *American Hospice, Inc. v. Sebelius,* Case No. 1:08–cv–01879, slip. op. at 58 (N.D.Ala. Jan. 27, 2010) (ex. B to Dkt. 29); *see also* cases identified in notice of status of related cases (Dkt. 11) and subsequent notices (Dkts. 35, 43, 44). To date, every district court that has addressed the issue has found the regulation facially invalid, including the United States District Court for the Northern District of Texas in *Lion Health Serv., Inc. v. Sebelius,* 689 F.Supp.2d 849 (N.D.Tex.2010) (Dkt. 35–1) and *Solaris Hospice, Inc. v. Sebelius,* Case No. 4:09–CV–691–Y, slip op. (N.D.Tex. May 3, 2010).

The court agrees with Grace, and every other court to have addressed the issue, that 42 C.F.R. § 418.309(b)(1) fails the first step of a *Chevron* analysis. That is the end of the court's *Chevron* analysis. The court finds § 418.309(b)(1) regulation is facially invalid and may not be enforced. Grace's motion for summary judgement on invalidity of the regulation should be granted, and HHS's motion for summary judgment should be denied.

### Recommendations

The court recommends that as to Grace's 2006 claim, HHS's motion for partial dismissal (Dkt. 9) be denied, but that summary judgment be granted in HHS's favor upholding the PRRB's denial of leave to file a late appeal.

The court further recommends that as to Grace's 2007 claim, Grace's motion for summary judgment (Dkt. 14) be granted, and HHS's motion for summary judgment (Dkt. 25) be denied. Specifically, the court recommends the district court declare that 42 C.F.R. § 418.309(b)(1) is invalid, and permanently enjoin HHS from enforcing against Grace the 2007 NPR or any future NPR calculated in accordance with the invalid regulation.

The court finally recommends that this matter be remanded to the PRRB for a

---

**20.** *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941).

**21.** In the *Autumn Bridge* case, for example, on remand HHS calculated a hospice cap repayment obligation in accordance with the statute, and ultimately determined that the plaintiff did not meet the $10,000 damages threshold. *See* Jan. 25, 2010 determination of the Administrator, Centers for Medicare and Medicaid Services (Dkts. 32–2, 32–3).

determination of Grace's 2007 cap repayment obligation properly calculated in accordance with § 1395f(i)(2)(C), and the amount of any refund due to Grace as a result.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* FED. R. CIV. P. 72.